Hunter vs. The State of Georgia.

---

JIMSEY A. HUNTER, plaintiff in error, vs. THE STATE OF GEORGIA, defendant in error.

Where in a criminal case the defendant applied for a change of venue, upon making affidavit that an impartial trial could not be obtained in the Courts where the homicide was committed, and the Court overruled the application, and went on with the trial, and obtained a jury :

Held 1st. That this was not error in the Court. The provisions of the Constitution clothes the Superior Court with power to change the venue when the presiding Judge is satisfied an impartial jury cannot be obtained in the county, and while the Judge may, in his judgment, become satisfied of this fact by aliunde evidence, still we hold that that most satisfactory method of arriving at such conclusion, as well as that most within the contemplation of the provision of the Con-

stitution, is to test the question by trying to get a jury in the county where the crime was committed.

2. Where the witness for the State, admitted upon cross-examination, that he had given a different statement upon examination at the inquest, and stated his reason to be fear of the accused with whom at the time he lived as a servant, and that he had made a similar statement to that, then given, to the brother of the accused, and *aliunde* evidence was admitted to show his conduct and appearance upon the former trial as a part of the original evidence offered by the State :

*Held*, That this testimony, under the facts in this case, was properly admitted, and the theory of the defense upon cross-examination by them, let in the facts disclosed by the evidence in this case.

3. When in an indictment for murder the evidence showed the accused to be a rejected suitor and the deceased an accepted suitor, rumors of the approaching marriage and of such engagement was brought home to the accused and was offered and admitted by the Court as a fact to show motive for the crime :

*Held*, That it was properly admitted as a fact or circumstance in the case. Every fact or circumstance shedding light upon the transaction will be permitted to go to the consideration of the jury, either in attestation of innocence or pointing to the perpetrator of the crime ; and the facts of this case show its importance and materiality.

4. When in the argument before the jury, counsel for the State contended that confessions were the highest species of evidence, and the counsel for the defendant insisted it was not, under the rule laid down in the Code, and the Court refused to charge the jury that it was not the highest evidence, but charged the jury in the very language of the Code on the subject of confessions :

*Held*, That this was no error—it was not the duty of the Judge to classify the evidence as to its weight or consideration, or intimate any opinion thereon.

5. When the evidence in the case was mostly, if not entirely as to its material parts, circumstantial, and the Judge charged the jury, as to their rights under the facts, if they found their verdict upon circumstantial evidence, reading from the Code :

*Held*, That this was not error, for the reason that the jury by such charge were only instructed as to their legal rights in the premises.

6. Where, upon the trial, after some of the jury were in the box, but the whole not impanneled, and in the presence of the Court, those sworn were seen by counsel for accused reading a newspaper which contained an article reflecting upon the counsel for prisoner, etc., and no motion or notice was then taken in regard thereto :

*Held*, That this was not such irregularity upon the part of the jury as would be sufficient to set aside the verdict, and that such acts transpir-

Hunter *vs.* The State of Georgia.

ing in the Court room and in the presence of the Court and of counsel, when not objected to, will not be favorably regarded after the verdict.

7. When a juror upon a criminal case has been placed upon trial and accepted by the Court, and is afterwards impeached by affidavits, and counter-affidavits sustain him and his co-jurors, and show he was the very last to find a verdict against the accused:

*Held,* That the juror appears by the proof exculpated of any prejudice arising from previous statements made by him, and this Court will not set aside the verdict of the jury upon such point.

8. When all the facts in the case sustain the verdict, and the law has been fairly given in charge:

*Held,* That the Court will not interfere with the judgment of the Court below refusing a new trial.

Murder. Evidence. New Trial, etc. Tried before Judge ALEXANDER. Brooks Superior Court. November Term, 1870.

Thomas M. Alexander, on the night of the 12th of July, 1870, was found in the road, in said county, dead. His death was caused by several buckshot projected from a gun, eight or ten steps off, into one wound, in the posterior part of the right shoulder. A coroner's inquest was had, and subsequently Jimpsey A. Hunter was indicted for murdering him. Before going to trial he made affidavit that, " on account of the excitement and prejudice against him in the community he could not obtain a fair trial in the county of Brooks, and moved for a change of venue. The Court held that he ought not to change the venue unless, after trying to get a jury, it should appear that an impartial jury could not be had in Brooks county, and refused then to change the venue.

A jury was impanneled after about two hundred persons had been put upon their *voir dire*. The Quitman Banner is a newspaper published in said county every Thursday afternoon. Three persons who subscribed for it, and another who was a son of another subscriber, got the paper of that week, and, on Friday morning, were summoned as *tales* men and sworn to try said case. While the balance of the jury was being made up these jurors had and were reading their said

paper, and Hunter's counsel saw them doing so. The paper contained the following two allusions to said case :

### THE SUPERIOR COURT.

" The November Term of Brooks Superior Court commenced on last Monday morning—Judge J. R. Alexander, presiding. The local and neighboring bars were well represented, and the business of the term appears to be progressing satisfactorily.

" The call of the civil docket attracted but little attention from others than those interested ; but when the criminal docket was entered upon, on Wednesday evening, and the case of the 'State *vs.* Jimpsey A. Hunter,' charged with murder, was called, the Court-room was soon filled by an apparently interested and anxious public. For it is a case of great importance—the issue involved being life or death— and the circumstances surrounding the case being of such a character as to astound, and, in a measure, mystify hundreds who have only heard rumors of the circumstances attending the killing of Thomas M. Alexander.

" The prisoner having been brought before the Court, his counsel moved that, for certain specified reasons, the trial of the case be transferred to another county. The motion elicited considerable argument, and occupied the balance of the day. On the following morning, (Thursday) his Honor, Judge Alexander, after a review of the argument, decided to overrule the motion for a change of venue, until after an attempt had been made to secure a competent jury. At this writing the call of the special venire is progressing, and it is our opinion that an impartial jury can be procured."

### DEFAMATION OF THE CITIZENS OF BROOKS.

" As a general rule, the eccentricities of certain members of the legal profession are excusable ; the display of their oratorical ability, although frequently damaging to their clients, is amusing ; but when they override precedent, set at defi-

Hunter *vs.* The State of Georgia.

ance established rules of courtesy, and in an effort to carry their point, cast off all restraint, and characterize an entire community as lawless, prejudiced and unjust, we must consider and protest against such a line of argument, as simply *infamous.*

"In an argument before the Superior Court on last Wednesday, on a motion to transfer the important case of the 'State *vs.* Jimpsey A. Hunter,' to another county for trial, a zealous advocate from the county of Thomas, took occasion (and it is not the first time) to villify and outrageously slander the entire community of Brooks county.

"He charged that the entire body of county officials, from the Ordinary to constable, were inimical to the defendant, in the case; by implication, he charged that the large, intelligent, respectful and orderly assemblage of citizens then in the Court-room, was a mob, thirsting for the blood of the prisoner; that our entire people, from the devout preacher to the most humble laborer, was *prejudiced* against the State's prisoner; and that it was utterly impossible to impannel a jury of twelve men who would render an honest verdict in the case under consideration—notwithstanding they would be *sworn* to render such verdict in accordance with the law and the testimony; that the *swelling tide of prejudice* would swerve them from the path of duty.

"Of course this is *only* the *honorable* gentleman's *opinion* of the character of our citizens, and, therefore, strictly speaking, is of *little* consequence; but even if true, our condition might be worse—a greater infliction than all alleged depravity, *might* be imposed upon us.   We thank our God the *distinguished* lawyer is not a resident of the county!

"We do not censure the gentleman for the exhibition of zeal in the defense of his client; it is right and proper—and we pray God he may be able to produce evidence abundance to free him of the serious charge preferred—but think such zeal should be bounded by a trifle of *discretion.*   The intemperate charges preferred against our people, are, of course,

utterly false and slanderous, and we spurn them as the impotent ravings of one who has lost the vigor of youth, and now mistakes billingsgate for legal lore.

" In this connection, on behalf of the vilified citizens of the county, we tender thanks to Captain H. G. Turner, for his eloquent, vehement and masterly vindication of our character, as order-loving, law-abiding men, and peaceful, moral citizens. It was a grand spectacle to behold the cool, modest and eloquent young attorney. (who will, ere long, take position at the head of the bar of Georgia,) hurling back the anathemas and rebuking the aspersions and false conclusions of one whose age and experience should have, at least, counseled moderation and discretion, when assailing the manhood, justice and morality of an entire community of high-toned citizens."

Counsel did not call attention to this matter till after the verdict, though they knew the contents of the paper. It was shown that Alexander had been at the house of Colonel Gaulden visiting his daughter till a late hour that night; that his horse had been hitched near Gaulden's gate and in sight of the public road; that his dead body was found in the road not far from a haw bush, about one o'clock that night, had, in the wound, three buckshot; and that paper wadding, blood and tracks were found near this bush. The evidence to show that Hunter shot him was as follows:

Henry Frazer, a negro, living with defendant at the time of killing, had been out serenading, and was of the party who found the dead body. He testified as follows:

" We went home, to defendant's; he was at home when we got there; the dogs barked as we came up to the house; defendant said: ' Hello ! Serenaders !' We told him what a bad misfortune we had found. He said, ' What was it ?' told him we had found Mr. Alexander dead. He said: ' Lord, what a pity !' and told two of us to go into the field and hunt the horses; I and Sampson Maxwell went; we

Hunter *vs.* The State of Georgia.

were gone about one hour; did not get the horses; defendant, Ben. Henderson and Sampson Maxwell then went on down to Mr. Alexander's body; I went to Colonel Jones', with Mitchel Harvey, to let Colonel Jones know it; defendant did not send any one to Dr. Alexander's; he made remarks about sending there, but did not send any one; next morning I noticed a mark on defendant's hand; it looked like it was scratched by the briars—the mark seemed to be fresh. Some two or three weeks before this defendant came to Quitman to get his gun fixed, and told me not to use it any more; it was a double-barrel gun. I never heard defendant say anything about Mr. Alexander more than other gentlemen, but heard him say, ' if he and another young man was going to see a young lady, and the other young man was to cut him out unjustly, he would flog him;' have heard him say, ' he had no use for Mr. Alexander,' but did not hear him assign any reason for it. The body of the deceased was found in Brooks county; I came down to Quitman with defendant to sell oats; we stayed all night; he and Hardy Hunter came in the buggy together; went back home next day, in the evening; I went also the next day, in the evening; he was at his mother's when I got there; I went on home with the wagon; I came after that back to Quitman with sheaf oats; Edmondson & Peacock sold them; it was late in the evening before they got through it; I suppose I was about a mile from town when dark overtook me; when I got home defendant was absent; went in the house and lighted the lamp; soon after I went out to the lot with my oxen, to take them out; I called to him; he did not answer; he came up after awhile—did not say where he was—but said he could have laid his hand upon me; in going home, I went by Abram Hunter's, Colonel Jones', Captain Gaulding's, and Mr. Morrow's; do not remember seeing any horse at Captain Gaulding's gate that night; got home that night about 10 or 11 o'clock; it was oats made this year; deceased was killed after this, I think; defendant was standing in his

door when we got there, after we found Alexander's body. I left Ben Henderson, Mitch Harvey, Rose Maxwell, Sampson Maxwell, Delia Thomas or Thompson, at Mr. Hunter's when I started off on the serenade. Ben Henderson and Mitch Harvey came to me at Col. Jones', after supper ; went serenading frequently before this ; went one Saturday night with Mr. Hunter to take a bee tree ; went over to Mr. Jones', and failed taking it; loaded our cart with shucks; started back home ; as we passed Mr. Gaulding's, he insisted that I should go and look at a horse, and see whose it was ; went to see the horse, and told him it was Mr. Alexander's ; he said nothing more, and we went on home; the horse was hitched to a tree in front of the house ; can't say how long it was before the killing; it was this year, but can't say what month; though it was about the first or last of July when he went to take the bee tree; can't remember the month Mr. Alexander was killed ; it was after the trip made with the oats; the bee tree trip was made before the killing.

*Cross-Examined.*—"I was at Col. Jones' on the night Mr. Alexander is said to have been killed ; I went over there for some tobacco ; I went at my own accord; got the tobacco ; stayed there until about 11 o'clock, then went to Adolphus Wright's, stayed there about one hour ; then went to Matilda's, stayed there about half an hour ; then went for home ; I played for Hardy Hunter that night, at Colonel Jones', until about 11 o'clock ; it was at Captain Gaulding's place I saw Matilda; got there, I think, about one o'clock; Colonel Jones' is a mile or so from Captain Gaulding's; Colonel Jones', in a straight line, is about a mile or three-quarters, the near way, through the plantation, from defendant's ; the same distance from Hunter's to Captain Gaulding's, I think; I don't know how far from Captain Gaulding's to the Okapilco bridge, but I think three miles and a half ; from Captain Gaulding's to the Peacock store is two hundred yards; thence to the corner fence sixty or seventy yards ; thence to the gin-house three-quarters of a mile ; defendant

lives about half way the lane—nearer to the old gin-house
than the creek; Dr. Alexander lives beyond Mr. Lane's; I
think it is four and a half miles from defendant's to Dr. Alexander's ; we found the body between Capt. Gaulding's and the
old bridge—nearest to the bridge—about half a mile or three-quarters from Capt. Gaulding's—about half a mile from
Morrow's; it was nearest to Mr. Morrow's; when the body
was found I was excited, and I felt that home was the nighest
to me, and said, 'let us go home.'   Defendant was standing
at the door when we got to his house; the dogs barking at
us; the door was open; it was bright moonlight; do not
recollect swearing before, that he came out of the door;
can't say what defendant's habit was about getting up when
the dogs barked; don't recollect that defendant told us to
go and give the news until after we went for the horses.   I
was so excited at the time that I can't state certainly, whether
it was before or after we went for the horses that defendant
said to carry the news; I think what I have said to-day is
correct; I was so excited that I can't tell whether it was before or after we came from the field.   I know that was what
he wanted with the horses, but can't say the time exactly he
said it.   Have not taken anything to drink since we went to
dinner; did not find the horses in the field : defendant told
Mitch to go to Col. Jones'; I went with him; I went nowhere else; there was no horse found to go anywhere else;
Mr. Hunter was not in the habit of visiting his neighbors
much at night; he went to Mr. Morrow's occasionally in the
day time.   Defendant and I were in conversation together
about courting, and he, defendant, said, if any young man
was to cut him out unjustly he would put him to punishment; can't say how the conversation got up; Sampson
Maxwell was present; can't say who first got up the conversation; did not say who he was courting; did not mention
anybody's name; can't say what I replied, if anything; did
not hear Mr. Alexander's name mentioned at that time; at
another time heard him say he had no use for Mr. Alexan-

der; I think this was said to Sampson; I heard the remark. I never went to defendant to borrow his bowie-knife—I carried it sometimes. I just carried it to carry it in the name of bowie-knives; I carried his gun sometimes; he never told me not to use it till after he had it mended. This was sometime before Alexander was killed—the first part of the year; he shot birds off his oats; I shot turkeys, squirrels, etc.; the gun was generally kept loaded; when I brought the gun home empty, or he wanted to use it next day, he would load it; I think there was a light in Capt. Gaulding's house the night I passed there, with defendant and Sampson Maxwell in the cart, and I went to see whose horse was tied there; do not remember anything was said about any one being sick, or doctor, etc.; can't say positively there was a light, but think there was; can't say how long before Mr. Alexander was killed; think it was a moonshining night."

COL. JOHN DUNN testified as follows: "On the morning after the homicide, information was brought to the family, and Dr. Alexander and myself went to the place as soon as we could get there; reached there a half or three-quarters of an hour by sun; found several persons present—remember Capt. Gaulding was there. A few minutes afterwards looked down the road towards Clark's creek, and saw defendant coming up the road; turned my face from him; set down in the corner of the fence; did not look at him for sometime; did not notice particularly what effect the presence of the dead body would have upon him; shortly after this some one suggested we walk up the road to the place where it was supposed the shooting was done; within two hundred or more yards we saw fragments of paper in the road; two or three parties, with myself, picked them up—as near all as we could—they were handed to me; defendant, near by, remarked that was not half; I made no reply; Capt. Gaulding said he would like to know what became of the rest; Mr. Hunter made no reply; very soon thereafter I returned to Dr. Alexander's home; just before I got to

Clark's creek, I noticed defendant on his horse, going in the direction of his home; he rode in a gallop most of the way from the creek to his home—at least faster than I drove; he got to his house a few minutes before I passed it; I turned over the fragments of paper picked up to the jury of inquest; Capt. Kingsberry handed me a package this morning; witness then opened it, and said the fragments of paper therein resembled those he picked up—they looked as though they were well suited for wadding; saw some foot prints rather on the north side of the tree, as if some one had been stamping around there; did not examine them minutely; witness here explained a diagram, pointing out the various places referred to; saw signs of blood near by there; going from Dr. Alexander's to Capt. Gaulding's the road leads by defendant's home, thirty or forty paces; there is a clear, open view from the house to the road."

*Cross-Examined.*—" The place where he was killed may have been a little nearer Morrow's than defendant's; Morrow's house may be a few paces further from the road than Hunter's; there are some houses on the road at Morrow's, but there is an open view from the dwelling to the road; there are a number of negroes about Morrow's and Captain Gaulding's; there is a negro house three or four hundred yards from where the body was found—one hundred and fifty yards from the haw tree; the fragments of paper were found about ten or twelve feet from the haw tree; the fragments of paper found I do not think were all of the wadding; do not know where the balance is.

*By the State.*—" If any of the deceased's valuables were taken we never discovered it; his watch and a little money on his person we got."

SAMPSON MAXWELL, a negro, testified: "I lived at defendant's this year, working with him; on Tuesday night defendant came home about an hour after night; he called for his house key. I went with the key and unlocked the door; he went in, lit his lamp, took up his gun, commenced

wiping it out, and said to me: ' Sampson, how long is it to supper? I want to go and look round my hogs.' I asked what was his hurry? He replied, he wanted to go and see if he couldn't catch old Monk; I said to him, the hogs are not fat enough for anybody to steal yet; he said, 'you don't know how them hogs have improved since I put them in the field; go and hurry Rose with supper.' I then started out, and Ben. Henderson and Mitch Harvey was coming in the door; after supper I went into the lot, helped Rose milk the cows, came right back and lay down; I became restless and could not sleep; I lay there, and after awhile I got up, pulled off my shirt, and thought I would sleep then; about midnight, as near as I can come to it, I heard a gun shot, and then two screams, and sounded (as witness imitated to jury.) I hunched Rose; she spoke and said, ' Do you hear that gun?' I said, ' Yes—that person hollows like he was hurt, and I hope none of the black folks have gone yonder and pestered Mr. Hunter's hogs, and now he has shot them.' I got right up and went to the door, opened it and looked out, heard nothing then. I shut the door, walked right back to the bed, and just as I got to the bed, heard the horse come a running, and the dogs ran out, and I went out. I glimpsed the horse as he ran by, but never spoke to the dogs; just as I went to speak the dogs hushed; then I felt troubled, and turned right round by the little steps that were there, and sat down; by this time I heard a fiddle—heard one tune played while sitting there; sat there ten or fifteen minutes; the next thing I saw, was the defendant coming right through the field towards me, very fast, with his gun on his shoulder; he came up to me, and about ten or fifteen steps from me he said, ' Who is that, Sampson?' I got up and said to him, ' I thought you would have had beef—I heard you shoot!' he said, ' No, I didn't shoot!' I said, ' Yes—why, didn't you shoot? I heard some one hollow, and they hollowed like they were hurt.' He then said to me: ' Yes, I shot, but don't you say nothing about it; if you do your life will be

in danger!' Then he said something else, which I cannot now recollect; he went into his house, and I went into mine; about an hour and a half afterwards, the serenaders came up : Ben. Henderson, Mitch Harvey and Henry Frazer ; I heard very loud talking at the house; by this time defendant commenced calling me: 'Oh! Sampson! Oh! Sampson! they say that Alexander is killed!' Then I got up and opened the door; he said : 'Come here, quick!' came to the door, and said, 'Yes, I heard ·the horse running by.' He said, 'Yes, I heard it too, but I thought it was some of Bill Bryant's fool,' and said, 'go and get my horse; you must go and let the neighbors know.' I said to him, the horses are in the field. He said, 'Go and get them ; take Henry along to help you.' I and Henry went into the field and hunted an hour ; came back and told him we couldn't find the horses ; he said, 'well, let us take it afoot ; Henry, you and Mitch go over and let Mr. Jones know ; and I, Ben. Henderson and witness will go up to where Mr. Alexander is killed.' He, I and Ben went on to about ten steps of deceased, and he said : Sampson, you and I'll stay right here ; Ben, you go on and let Mr. Morrow and Gaulding know, and we will stay right here till the company gathers. After the company gathered, I, defendant and Henry Frazer went back to the house to breakfast; in going back, just before we got to the house, he went ahead; after we went back, I saw Mr. Hunter, when we were carrying deceased up to Mr. Morrow's, going up the road toward Mr. Gauldings, and a short time afterwards—can't tell how long though—Rose came to Mr. Morrows, and said for me to go there, the cattle is on your cotton ; when I went there, defendant said to me : 'Have they questioned you any?' I told him yes. Defendant said : 'What all have they said to you?' I said, I have not said anything to hurt you! Defendant said, 'No, don't you!' then said, 'I did love Charlie Gaulding—she and I were engaged to be married when we were going to

school, but old man Gaulding kept her out of my way—carried her off up the country.'

*Cross-Examined.*—" Was sworn on the inquest; what was read over I testified then; swore to tell the whole truth then, but I was afraid, because Mr. Hunter threatened my life for seeing what I did; he threatened it when he first came up to me in my yard; no one was present but he and I; swore on the inquest to a lie, because I was afraid to tell the truth. Suppose I could have told a lie and said I knew nothing about it, as well as have sworn to one by telling what was said then; the remark that defendant made that scared me was: ' Yes, I did shoot; don't you say anything about it; if you do your life will be in danger.' I did not say anything about it before sworn; thought I would tell some of the truth; don't know Captain Turner, that I know of—Oh, yes, Mr. Turner—know him; he wrote out a paper I swore to before Mr. Dukes a few days after the inquest—it was on Saturday; did not say the reason I made that affidavit I was afraid they would put me or my wife in prison; was at Mr. Morrow's when that affidavit was written out for me; Mr. Dukes was there when I swore to it; they sent for him; Kingsbery was there; Jesse Hunter, Hardy Hunter and W. McCall, came there after the affidavit was made; Captain Gaulding and Dr. Alexander were not there; Smith was there. Mr. Kingsbery carried me there from my place. They told me they wanted the truth out of me; Kingsbery did not tell me what they wanted as we were going on; Henry Frazer was there, sitting on the door; I knew what I had told him; they told me they wanted the truth out of me—if I knew anything, they wanted me to tell them. I said I was a poor black man, had no protection, no friends, and if they would protect me I would tell them the truth, so far as I knew it; they said they would protect me; that I would live as long as God would let me; that I wouldn't die by people killing me; they did not say how long they would protect me. I then told them the truth, and they wrote out the affidavit;

Hunter vs. The State of Georgia.

they then carried me to Mr. Alexander's, and then to Mr. Smith's; went in a wagon; Smith's is sixteen miles from Quitman; it was Captain Gaulding's wagon; Mr. Smith is in Florida, on Mr. May's place; they carried me there to work; Smith hired me to work on the farm after I got there; they said they would send me down there to stay—it would be a safe place; people could not get in there to interrupt me. I am scary of white folks; always have been; aint afraid of a negro; never was; was scared and troubled when Kingsbery came after me; was more troubled than scared; was scared all the time; Kingsbery was the sheriff; when I got over to Morrow's I was scared, troubled and felt bad; did not talk with Jesse Hunter after the affidavit was made; don't recollect telling him that I was afraid some of the black ones would be put in jail; talked with McCall and Mr. Hunter; felt, after I was told that they would protect me, that I was delivered; defendant was in jail then; was not afraid of him then, but was afraid of his people; they could have found me down in Florida; they never threatened me; they treated me kindly. *I once told Jesse Hunter what I saw and heard, and he said, keep that to yourself till the judgment day; this occurred the next day after defendant was brought down here.* Rose was present; Jesse Hunter was present, talking to Rose, trying to get her to say that Jimpsey was in the house; said that house there would save Jimpsey; Rose was scared also. A colored man named Jack came down to Florida to see me; did not tell him I was afraid I would be put in a dungeon; did not tell him I was afraid any of the serenaders would be put in jail; told him I believed I was put there by the Lord, as a witness; didn't know what I was doing; was at Morrow's when the dead body was there; I put my hand on the head and said: If I know anything about this more than I have said, I hope God Almighty may strike me dead! Mr. Gaulding told me to say this to see if He would; and said if I told a lie and did this,

God Almighty would kill me. I am a member of the Methodist church; Capt. Gaulding is a Baptist minister; he said this to me, but I did not believe it; I have seen many ministers who didn't tell the truth. Jimpsey Hunter put his hand on the dead body; saw defendant about one hundred and fifty yards before he came up to me, when I was on the steps; this was the night of the shooting; it was moonlight; I knew it was him by his walk; there was a fence between us. I watched him coming on towards me; there was no house between us; he did not come from right around my house; he came sorter quartering by my house. I did swear as was read to me, and meant that he came sorter quartering, as described by the witness. He did not have to come from round the house for me to see him. Jimpsey Hunter is a lame man. Think the gun was fired about midnight; the horse came quick after that; I jumped up, saw a glimpse of the horse; in an hour and a half the serenaders came; heard the fiddle after the gun was fired. Frazer used the gun when he wanted to; was in the habit of going in the house and getting it when he wanted to. When the serenaders came up to the house, there was loud talking; there was no one at the body when we got there; defendant was at home when the serenaders came; he was there an hour and a half before they came; they came in an hour and a half after the gun fired. Hunter got to the house in ten or fifteen minutes after the gun fired; I went to bed soon that night, and stayed there until the gun fired; then got up at once; the horse passed very quick after the gun fired; never sent word by Rose to any one that if defendant got clear I would be killed; never sent any such word by Rose to anybody.

COLONEL WILLIAM JONES: "I was present part of the time when the neighbors collected around the body of the deceased; prisoner had some conversation with me near Morrow's house. Doctor Williams came up and said he would like to have some conversation with me; we stepped off to talk; as we commenced to converse defendant came

up and said : 'I would like to have a word with you;' I said, Doctor, hold on till I see what Jimpsey wants; we went to one side a little, and he said to me, 'I am accused of killing Tom Alexander, and don't want to stand a law-suit; I believe I'll leave; what do you think about it?' I said, Jimpsey, you know whether you can prove yourself at home that night; he said he could; said I, who by? He said by Sampson and Rose; I said, Jimpsey, if you can prove that, I don't see why you should be in any dread of a law-suit; said I, were you at home all that night? He remarked to me he had thought of going to the mill pond to go in washing, but recollected he had been taking sulphur and turned back; I said, if you want to leave, Jimpsey, I will give you all the assistance I can; I then said, you had better go see your mother and brother Hardy, and advise with them, and not take my advice; he said, my horse is hitched over yonder; will you take him over to your place and I will walk; he then went to my place.    This conversation occurred at 8 or 9 o'clock in the morning; did not see him any more till 12 or 1 o'clock; he was then in Morrow's house; at 2 or 3 o'clock, in Morrow's house, he touched me and we walked off towards the water pail, and he said to me, ' What do you think about it?' I said, I do not know what about it; I have been standing round here since you left, but have not yet been called in question about it; asked him if he had seen his mother and brother; he said he had; what did they tell you? he said they told him to come back; if he left suspicion would rest upon him. We then went to the opposite side of the house, west from the water pail; he then asked me again what I thought about it; I said, I don't know, Jimpsey; as your mother and brother have advised you to remain, perhaps it is best.    He said, 'I don't know; I don't want to be troubled in law; can't you go and see Sampson, and find out what he is going to swear to?' I said, I don't know, Jimpsey; I don,t like to go out there and hold any conversation with Sampson; they might think I was

meddling where I had no business ; he said, 'go and seeand find out what he is going to swear to ; I'll stand about here, and if you can find out, come back and let me know.' I left him and looked about for Sampson ; got my eye on him. Just then the jury of inquest was got together, and Sampson was called, and I had no further conversation with him. I live about a mile and three-quarters from the prisoner, through the fields, but the usual route is along the road by Capt. Gaulding's ; that way is further. I was at home the night of the homicide ; but did not see the defendant ; directly I got in the house from the field, the supper bell rang ; I went in and my little boy came running in and asked his mother to let him go home with Jimpsey ; she said no, at first ; I asked then where Jimpsey was ; he said, out at the gate ; and then I directed him to be called in to supper ; sent word back he did not have time ; I said to my wife, let the little boy go on with him ; this was quite early—not dark good ; the boy went ; I have heard him say that he could have married Miss Charlie Gaulding, if it had not been for the Captain and his wife ; on one occasion I said to defendant, Jimpsey, I think Charlie is gone—she is going to marry Tom Alexander ; he sorter laughed, and said he thought it was doubtful.

*Cross-Examined.*—" I and Jimpsey went a fishing once, and in our conversation Charlie Gaulding's name was brought up, and I said to him to marry her if he could ; he said the Captain and his wife were opposed to it, and that he had no place to take her ; I said you can take her to my place ; on another occasion he also said that the Captain and his wife were opposed to it, and talked as though he did not have much use for them ; this was after the land disagreement. Do not know of defendant visiting them for a year ; it was spring a year ago, he said he didn't have much use for Captain, etc.; can't say of my knowledge that he has visited there since. I was at the inquest ; did not see Graham or Sampson sworn ; I did not hear anything said as to any particular per-

son they wanted to fasten it on ; they seemed to want to find out the man that did the deed ; in the afternoon conversation, the defendant, in reply to a question from me, said it was Captain Gaulding that charged him ; he remained there after I left and went home ; have never had any conversation with Sampson. Defendant brought my little boy, four years old, next morning, to where the dead body was ; I carried him up to Morrow's; he was carried home from there. I pretty generally kept my gun loaded, and have loaded it at night ; have seen Henry Frazer going about with a double-barreled gun ; have seen him with defendant's gun a few times ; he has applied to me for powder and shot ; am familiar with defendant's place ; know how the houses are situated. The last conversation testified to, when anything passed about Charlie Gaulding's marriage, was about three weeks before the killing."

DELIA THOMPSON.—"I was at the defendant's the night of the killing ; I got there at dark ; defendant got there about an hour in the night ; while the woman of the house was getting supper, I heard three caps pop in the house ; said to the woman, it seems somebody is fixing to go out shooting to-night. She said, ' it is Jimpsey cleaning out his gun.' She said he had some fat hogs in the field, and he was going out to look round his hogs ; supper was eat ; Sampson and his wife went to the cow pen ; I washed up the dishes ; when she came back she fixed a place and told me to lie down ; did so ; when the gun fired that woman got up in the bed and said, ' Lord, Sampson, I heard a gun fire!' He said, ' Which way ?' She said, ' Up the road.' In a few minutes the horse came by, and tried to come to the house two or three times, but the dogs wouldn't let him come ; Sampson got up then and went out, and never came in the house no more till after defendant come and was talking to him ; when defendant came up, he said, 'Sampson, this you ?' Sampson said, 'Yes, this is me.' He and Sampson stood and talked awhile, and I heard him say, ' Sampson, if you ever tell this I will kill

you.' This was about an hour and a half before the sere-naders came in. When Frazer came he said, ' Sampson, I have met with a very bad accident to-night.' Sampson said, ' What is it?' He said, ' I found a man dead in the road up yonder.' He asked him who it was ; he replied, ' it looked like Tom Alexander as well as I could see in the night.' Defendant came out and asked him where was he ? He re-plied he was just across the branch. Defendant said, ' Boys, it wont do to let him lie there till daylight in the morning ; some of you go down there and stay with me till they gather the company.' He lighted a lamp ; then he, Maxwell and Ben. Henderson went on down where he was ; the defendant came back to the house the next morning when the sun was about an hour high ; he took Sampson out to the chicken house, and they talked a right smart while, and he then came in and ate his breakfast ; then he took one of his little brothers behind him, and one in his lap, and they went on up to Mr. Morrow's ; I did not see him any more till 10 or 11 o'clock, when he came back home ; when he came back he came through the field, from towards his mother's ; he called Rose before he got to the house. I said, Rose, somebody is calling you ; and he said, ' Rose, come here, quick !' Rose met him at the horse lot gate, just behind his house ; I went to the door to look for Rose, and saw her running up the road towards Mr. Morrow's ; defendant came then to the cook house, and said to me, ' How nigh is dinner done, girl ? Rose said something is lacking for dinner—what is it ?' I said, I don't know. He told me to get the pan and come on to the house and get whatever it was ; went to the door and said I was afraid of the dog. He said, ' come in, the dog aint going to bother you.' I got in the house—he asked me, ' what is it ?' I said I didn't know ; he said he didn't know ; he then asked me was I married ; told him no ; said he wanted me to live with him, as well as I can remember, ' if he wan't bothered with the damn scrape that was on hand ; the way the thing is going now I expect to be bothered ;'

then said, 'go back to the kitchen and wait till Rose comes, and she can get it, whatever it was.' When I got to the kitchen saw Rose and Sampson coming, and they all went round behind the house and talked till just a few minutes before the sheriff came; Rose then came in the house; I went to the door and said to her, 'Yonder comes somebody now.' She run to Sampson and said, 'Yonder comes somebody now!' Sampson went round one corner of the house and defendant the other, and said, 'Sampson, what you know, keep it to yourself.' Sampson replied, 'I expect to do that.'

*Cross-Examined.*—"Rose called to Sampson; don't know whether he was asleep at the time; Sampson did not go off that night—only out on the steps; he had not been away that night; some one started that night to look for the horses, but they never went; they came back in a few minutes. Sampson, Ben. Henderson, Henry Frazer and Mitch were there in the early part of the night; some of them went off on a serenade after supper; they ate cold victuals; Henry Frazer did not drive up there with an ox-cart that evening; he carried off a fiddle; I went to bed about two hours in the night; the report of the gun and the man hollowing waked me up; I did not go to sleep any more that night; did not go out of the house until the serenaders went off. (The witness here described the distance between the houses.) I heard him talking in the yard; heard defendant talking with Sampson about an hour and a half before the serenaders came; the horse passed before I heard him talking; I heard the boys say it was not worth while to go, for the horses were at the back side of the pasture; he wanted the horses to send to Mr. Alexander and round to let the people know it. One of the little boys was there that night; I heard him crying; the other, defendant brought there that morning. The dogs would not let the horses come to the house that night; Sampson did not come back in the house till after I heard them talking out of doors; he came for his coat when he was going off. I don't know what defendant and Sampson were talking

about out on the steps; I heard him say, 'Sampson, if you ever say anything about this I will kill you.' When the serenaders came up I heard Frazer and Sampson talk; I never had any acquaintance with defendant; I have seen him passing the road several times; I have been staying with Mr. Hyers since the occurrence. I have talked with people about it. Edmondson and Dunn brought me here; I talked with them about it; Dunn asked me was I there that night, what I saw and heard, and who was there. I had started to hunt work, and as I passed, a woman told me Hunter wanted hands, and sent her little boy with me to Hunter's; Dunn came after me last Saturday; I went over the creek next day after the occurrence, to my brother's."

Z. T. DURHAM testified: "I have had some conversation with defendant 'about Miss Charlie Gaulding; (objected to and overruled;) defendant told me that he had heard that deceased had been making remarks about him; that he would call Mr. Alexander to account; can't say whether he said 'if it was so, that Alexander had been making these remarks about him;' he added, also, that he should have nothing to do with Alexander till after his marriage—(witness does not pretend to give the exact words)—for people might mistake his motives.

*Cross-Examined.*—"This conversation was last year; might have been last spring was a year; can't say what it was about that Alexander had been making remarks; don't know that it was about Miss Gaulding."

J. E. MORROW testified: "Resides nine miles from here; lives three or four hundred yards from Captain Gaulding, and one mile from Mr. Hunter. There was a conversation between me and defendant about Miss Gaulding the day before the homicide; Hunter asked me if I had heard the news; told him I had not; he said Mr. Harrel and Mrs. Cook were to be married in a few days; I then asked him when he thought Miss Charlie and Mr. Alexander would marry; he replied, he had thought they would, but did not think so

then; he asked me if I knew anything about it; told him I did not; that I had been over his crop that morning with Alexander, and that he had nearly finished his house, and I thought would marry some one soon, but did not know who. I had frequently heard it spoken of that Alexander and Miss Charlie were going to marry; Gaulding, myself and Hunter live on the Coffee road; Gaulding and Hunter on the south side; I on the north side; the land is all cleared on the north side—woods on the south side; two hundred and seventy-five steps from the haw bush to where the body was found; seven and a half feet from the haw to the middle of the road; the haw bush is thorny, dense growth; the limbs come out near the ground—it was very thick. I suppose a man might pass there in the day time, and not discover a man standing behind it; saw track behind it, as if some one had been standing there; the night of the homicide was a very bright moonlight night. Alexander usually hitched his horse to a black jack, eight or ten feet from the gate when he went to Captain Gaulding's; ten or twelve steps from the road that passes Gaulding's, going from Colonel Jones', the ground is open. I was waked at three in the morning by Ben Henderson, to go down to the body; went down with Captain Gaulding; saw several persons standing off a few steps from the body; did not know who they were until Mr. Hunter spoke, and I knew him by his voice; he said I had better not go too near, I might deface some tracks; that he had matches and a lamp that he would raise and light, and we could see who it was; he lit the lamp, walked up and said, in a low tone, 'It is Tom! poor fellow!' I went up, squatted down by the body, put my hand on his, satisfied myself that he was dead, and went after his father. This was in Brooks county; all these locations described are in Brooks county; it was in July, 1870, the homicide occurred.

*Cross-Examined.*—" Alexander sometimes stayed with me when he was visiting in that neighborhood; twenty-five times or more; Mr. Hunter and I had many talks; he said

he didn't want to marry until he had a good house; his house was not a good one; the haw bush is six hundred or seven hundred yards from my house—nearer to me than Hunters; did not hear the gun; my wife may have, but not certain that she did. Aaron Adams lives in a cabin, one hundred and fifty or two hundred yards from the haw bush; there are two or three trees at Captain Gaulding's where horses are hitched; Alexander's was a deep bay, black mane and tail—tall nag, slender built. Alexander was six feet tall—rode and walked erect; there were some young ladies at my house; when Alexander came there he would sit around the fire and talk with them awhile; have not seen Hunter at Gaulding's in twelve months; he used to go there, two or three years ago; my impression is that Hunter and Miss Gaulding were school children together. Mr. Hunter told me there was some unpleasantness between him and Captain Gaulding about some oats; Alexander's habit was to come to my house in the evening, have his horse fed, and then go the Captain's; that was when he stayed all night. Alexander had been going there for a year; don't think Hunter and Alexander visited them at the same time. I was in the jury-room the other day with the witnesses; I did not say to any of them that they had better mind how they swore; that Jimpsey Hunter would get out of this scrape, etc. I was not in the back part of Creech's store with the witnesses, or anywhere else; had no such talk that I can recollect of."

JOHN MORROW testified: "Resides with J. E. Morrow, at Okapilco. I was at home the night Alexander was killed; went to the body when the negro came after brother; had three negroes with me; when we got there defendant was there, and told us to walk right in the middle of the road; and I walked up to where the body was, and said, good morning, Jimpsey! And he said, is that you? I said it was John, and said, I suppose Tom is shot, and got down on my knees to see whether he was dead or alive; defendant was

about ten steps off, sitting down. We commenced talking about how bad it was Tom Alexander had to be killed riding along the road, troubling nobody; talked a good deal about him; when Captain Gaulding came up, defendant said, there was a dead man, and struck his lamp to see who it was."

BEN HENDERSON: "I lived at defendant's at the time of the killing. I was at home that night when defendant came home; it was about dark; he had his gun on his shoulder when he came; he loaded it, after he came, with powder and buckshot; this was before he eat supper. I was one of the serenaders that night.

*Cross-Examined.*—" We played at Matilda's house after the gun was fired; stayed there a while, played two pieces; said nothing about the gun firing; heard no one hallo; went on down the road, found a hat with flowers; then the body; then went to defendant's house; when we got there the dogs came out, and Hunter said, 'Hallo! serenaders!' He called Sampson out; sent him and Henry for horses; sent me to Gaulding's and Morrow's to tell about it; left Hunter's when I eat supper, and never went back till after we found the body. When we were going to Captain Gaulding's that night Alexander and the Misses Gaulding were at the meeting house; did not go by Captain Gaulding's gate; did not see Rose or Delia at Hunter's when we got back. Have lived at Mr. Jones' some: at Mr. Gaulding's, at Agramontes, in Thomas county, and all about. No one ever threatened me on either side if I swore in the case. When I started off, we passed by the door, and I said, Mr. Hunter has left the door open. I said, Mitch, call him; he called one time— no answer. Saw Colonel Jones' little boy that night; did not notice him when Mitch called; Mitch came out and closed the door; heard Hunter say he was going to look after his hogs that night; when he was loading the gun, I said, You aint loading with peas? He said, 'Look out, Monk.' Only one room to Mr. Hunter's house; his hogs' were rather slim; we went off immediately when Mitch called Mr. Hunter."

MITCHELL HARVEY : " I lived at Abram Hunter's when the killing took place ; I was at defendant's the early part of that night ; I went there a little before night ; the sun was down when I left our field—that is about two miles from Jimpsey Hunter's. Defendant was wiping out his gun when I got there ; he then loaded it with powder and buckshot. Defendant was not at home that night when I left there—I went in his house, and he was not there ; I left there as soon as I eat supper, pretty early in the night. I went into his house for some matches ; the door was open ; I called one time—no answer ; shut the door when I came out ; went to Captain Ganlding's, to aunt Tilda's house ; went by the big road ; saw deceased and some ladies at the church, two hundred yards or more from Morrow's ; the church is nearer Captain Gaulding's than Morrow's. I was one of the serenaders ; we found Henry Frazer at Mr. Jones' ; returned that night with the rest to defendant's place ; then I and Henry Frazer went to Colonel Jones'. Mr. Hunter loaded his gun ; didn't notice particularly what wadding, but saw him have some brown paper and some newspaper in his hand.

*Cross-Examined.*—" Can't tell who raised me ; I used to belong to old Mrs. Hunter, when she died ; said defendant was not at home, because I called and he didn't answer ; went in for some matches ; did not see any one in there ; he was not in the house ; did not notice for the little boy. Been at Mr. Abram Hunter's since the killing ; went to Captain Gaulding's quarter before we went to Colonel Jones' ; Jones lives on the right side of the Quitman road, this side of Morrow's ; went first to Captain Gaulding's, then to Colonel Jones', then came back to Captain Gaulding's ; went to Tilda's house ; didn't meet Frazer ; met him at Colonel Jones'; played there pretty late, I guess till nine or ten—can't say exactly. No one but Ben. went with me to Colonel Jones'; come back then to Adolphus Wright's ; I'll say it was about nine and a half or ten o'clock ; it may be a mile and a half or so from Jones' to Adolphus Wright's—may be a

little more; can't say how long it would take to walk that far; stayed about half hour there; about eleven when we left there; then went to Tilda's and played two pieces; the gun fired when we were going from Wright's to Tilda's; from Tilda's we went on towards Hunter's; played no more; found a hat in the road; may have been a quarter or half mile from Morrow's; can't say exactly; carried the hat on till we found the body; we said maybe we would meet somebody coming for it; but there was nothing said about each man paying a portion and one keeping it, that I heard. Found the body and said, let us go back and let Gaulding and Morrow know it; went a piece, and Henry said, 'no, let us go to defendant's.' Adam lived in a house two hundred yards distant from where we found the hat in the road; did not put my hand on the body; went close enough to see who it was. When we got to defendant's he said to them, go and look for the horses; in about half an hour they came back and said they couldn't find them. I went over with Henry to Mr. Jones', the rest went to the body; they said they were going there; when the serenader's went up to Mr. Hunter's, we talked in a common tone; I was scared near about to death; can't remember what we said; know what I say to-night. Came with Joe Spencer and Sam Williams here, last week; came to listen and to hear; my mind led me to come; my ma talked to me about coming; I have seen no subpœna for me to come; I wanted to get some things. I thought they would swear me if they swore the rest of the serenaders. I get some of my rations up at Mr. Kingsbery's, and some at the store; don't know who pays my expenses at Kingsbery's; consider him a good neighbor."

CAPTAIN GAULDING: "Was at home the night of the homicide; got home from Quitman a little after dark; deceased was at my home that night; went into the parlor and shook hands with him, and came out; cannot say certainly what time he left my home. I lay down after eleven o'clock

and he was there then ; at a quarter past three Ben. Henderson came and told me Mr. Alexander was dead in the road between there and defendant's ; I was much agitated ; sent out word to neighbors ; went down with Morrow to the place ; when we got there, Jimpsey Hunter said, 'Is that you, Colonel Gaulding ? there is a dead man there ; as you have come, we will see now who it is ;' that he had kept the tracks in the road, lit a match, went up and said, ' it is Tom poor fellow ;' as if he had been in doubt who it was. Witness described the localities ; he and Hardy Hunter had some conversation. After Dr. Alexander came, he and I examined and found blood between the body and haw tree; most blood near the tree ; under the tree saw where the breech of a gun had made an impression ; saw no tracks ; the direction of the wadding would show that the gun was fired from behind the tree, and a little after the tree had been passed ; the wadding consisted of two kinds of paper—one was newspaper and the other looked like house-papering. At the time of the killing, don't think defendant's home was enclosed on the front ; saw, a day or two afterwards, traces of blood on deceased's saddle. Mr. Alexander's visits to my home were acceptable to all the family ; Mr. Hunter's were not and had not been for a long time ; the rest of his family's visits were ; defendant's were not, and never had been acceptable to my daughter. Sometime, I think in the spring of last year, wife and daughter were standing together, one of them beckoned to me ; daughter said, ' Father, Jimpsey is in the parlor and I am not going to see him.' I said, you are right, daughter, I will go and tell him. Went into the parlor and let him know my daughter would not see him, but can't state the words I used ; this was the decision of my daughter as I understood it, and I told her she was right.

*Cross-Examined.*—"Do not know that a gun shot wound will bleed less at first than a cut with a knife; do not know how this is ; just behind the haw tree there is some fine grass ; the impression of the butt of the gun was in soft ground.

Over a mile from my home to defendant's; nine hundred yards to the haw; it is nearer to Morrow's than to defendant's; my house is three hundred yards further than Morrow's; the gun, I suppose, was not more than seven or eight feet from deceased when it was shot; I thought from the appearance of the face that deceased bled to death; do not know about these things—it is only my opinion. Defendant has not been at my home on a visit (that I can say certainly to my family and daughter,) since the time I speak of. The affidavit presented is my daughter's; he had visited my home previously to addressing my daughter; but it was not acceptable to my daughter. I had told him at one time that I would not sell him some oats; did not feel unkind to him, but there were some things which made me think it was best not to have anything to do with him; have had no dealing with him, that I recollect, in a year or two; never had much except to buy a horse from him. Sampson denied to me knowing anything about this case, especially as to Mr. Hunter; I tried to lead him on; it was not my expression, that if he put his hands on the dead body, etc.; another man made that expression, but he may have understood it was me. I did not say the words that he said I did; if he made the expression to-day, that I said these words; he did put his hand on the head of deceased, and said he did not do it and didn't know who did; there was no danger then of anybody hurting him. I sought an interview with defendant, and asked him the ground of his objections to me; one of the grounds of his objections mentioned, was that I and my wife were the cause of his not being seen by my daughter. He also alluded to the oats matter, and I acknowedged that I may have gone too far in that case; he also complained of my buying some land that he wanted; defendant was not a prisoner when Sampson was put to the test of putting his hands on the dead body."

SIMON WILLIAMS testified: "I lived with Captain Gaulding when the killing took place; Mr. Alexander was there

that night, his horse was hitched to a little oak about ten steps from the gate, in front of the house; the road runs within twelve or thirteen steps of the gate."

Captain H. G. TURNER testified: I was acquainted with Tom Alexander in his lifetime; he was about twenty-four years of age, and had lived here since the war. I was at the inquest, conducted the examination; Sampson was sworn; what I got out of him I got out by questions. He was interrogated and I don't think he made any statement only in reply to my questions; some person may have asked him a question, but I do not recollect it now. After the inquest, on Saturday, myself and others met at Morrow's, to obtain all the evidence we could; on the way to Morrow's we met Frazer; he went with us; there we met several colored persons; Sam Bryant, Gus McAfee, Morrow and his brother, and J. J. Hodges were present; we were seated on the steps; Sampson came up; did not see Captain Gaulding during the day. I said to Sampson, perhaps you are in fear, and if you will tell all you know about it, you shall be protected, if we can do it; some one else, perhaps Dunn or Smith, said the same thing; and while they said this I perceived a change in the witness. The conversation then ceased, and Sampson made his statement, just after saying, ' I'm a poor negro and my life is in your hands, and you must protect me;' that he had felt trouble about this thing; and after the statement made in the affidavit; but before it was reduced to writing, he also said: ' He believed God had put him there to see that thing.' [The above evidence of witness, as to the circumstances attending the taking of Sampson's affidavit, objected to by the defendant, and objection overruled.] Witness here explained a diagram showing the various localities.

*Cross-Examined.*—" The description of the diagram made by Dunn and myself differ in the points of the compass; I examined Sampson at the inquest, and the paper shown is the examination; the affidavit shown is the one taken on Satur-

Hunter *vs.* The State of Georgia.

day. At the the inquest there was no one present overawing Sampson, that I know of; before the affidavit was taken on Saturday, I remarked about fears (Dunn, Kingsbery and others were present) before Sampson said anything about it.

When Sampson Maxwell stated the conversation between himself and *Jesse* Hunter, in italics *ante*, defendant's counsel moved to reject it. The Court refused to do so, especially as it came out in cross-examination.

All the evidence of Dunn and others as to rumors that Alexander and Miss Gaulden were to be married was objected to by defendant's counsel, but the objection was overruled upon the statement by the prosecuting attorneys that they would show that defendant had heard this rumor, and that he, defendant, had been rejected by Miss Gaulden.

The testimony of Turner as to the circumstances under which Maxwell's evidence at the inquest and his affidavit were made, and what was said at the time, was objected to by defendant, but the objection was overruled upon the ground that, as defendant's counsel had tried to impeach Maxwell, it was proper thus to support his testimony.

The defendant offered no evidence.

During the argument of the case counsel for the State contended that admissions or confessions were the highest species of evidence, and to support it read 17th Georgia Reports, 146. Defendant's counsel said that was not true, and asked the Court to charge the contrary as hereafter appears. Defendant's counsel requested the Court to charge the jury as follows :

1st. The law presumes the defendant innocent when placed on trial, and requires that his guilt should be proven by competent and credible witnesses, before the jury can find him guilty.

2d. In civil cases the jury may weigh the evidence, and find according to its preponderance, but in a case of this character a greater strength of mental conviction is required and held necessary to justify a conviction.

3d. When the evidence is entirely circumstantial it should connect the defendant with the Criminal Act, 26 Georgia Reports, 633, head note.

4th. To convict upon circumstantial evidence the proof must be so clear as to exclude every other reasonable supposition but that of the guilt of the defendant; and if the jury can find any reasonable supposed case, consistent with the facts and yet consistent with the innocence of defendant, they are, under the law, to find him not guilty.

5th. A witness may be impeached by proof of contradictory statements previously made by him as to matter relevant to his testimony and the case.

6th. If the jury are satisfied from the evidence that any of the witnesses have sworn falsely in this case, then the credit of such witnesses is impeached, and such witnesses are entitled to no credit, except so far as they may be corroborated by other satisfactory evidence.

7th. Under the present law of this State admissions or confessions *are not considered as the highest species of evidence, but the law is that they* should be scanned with care and received with great caution, and a confession alone, uncorroborated by other evidence, will not justify a conviction.

8th. It is the duty of the jury to consider the evidence carefully, and to give credit only to such witnesses as they may think entitled to credit; and in judging of that credit, they may take into consideration the manner of the witnesses on the stand, the consistency or inconsistency of the witnesses' statements, and whether their evidence is contradicted either by statements of other witnesses under oath, or by their own statements, as to matters relevant to this cause heretofore made, whether under oath or not.

9th. It is with the jury, under the rules of law, to decide as to the amount of credit to be given to each witness, and if, upon full investigation of the law and evidence in this case, they have any reasonable doubts resting upon their minds as to the guilt of the defendant, they must acquit.

In charging the jury, he left out of the seventh request the italicized words, giving the balance of it. He further charged the jury that if there was any conflict in the evidence it was their duty to reconcile the same if they could, and if not to give the credit to such of the witnesses as they might believe entitled thereto. He also charged them as to the penalty in cases where the conviction is founded solely on circumstantial evidence, and read to them section 4257 of the Code, and instructed them to consider the question of recommending the punishment of confinement in the penitentiary for life, if they found defendant guilty. The other requests and such other instructions as were proper were given in charge to the jury.

The defendant was found guilty.

His counsel moved for a new trial upon the following grounds:

1, 2, 3. Verdict contrary to law, evidence, etc. 4. The Court erred in not changing the venue. 5. In allowing the evidence of Maxwell, which was objected to as aforesaid. 6. In allowing evidence of rumors of reported marriage of Alexander and Miss Gaulden. 7. In allowing the evidence of Turner objected to as aforesaid. 8. In leaving out the italicized words in the 7th request of charge. 9. In charging, as he did, as to reconciling conflicting evidence, etc. 10. In charging, as he did, as to recommending commuting of punishment, the jury being thereby made to believe that the Judge could, in his discretion, so commute the punishment. 11. Because of the said four jurymen having read said articles in the Quitman Banner while they were setting as jurors. 12. Because W. H. Harrell, one of the jury, was not impartial.

This juror, Harrell, had not only shown himself competent by his answer to the statutory questions propounded on his *voir dire*, but he had been *tried* by the judge and pronounced competent. To attack Harrell, defendant's counsel presented the following affidavit:

Mary E. Rainey affirmed, on the 2d of December, 1870, that on Sunday in July, preceeding the Court, she heard Harrell say, " from what he knew, the prisoner ought to be hung, and in substance, the prisoner was guilty of murder."

B. M. Collins and W. M. Collins each affirmed that about the 5th of October last, he heard Harrell say, " the prisoner should be hung." Timothy Carroll affirmed that said Dunn asked him not to allow prisoner's counsel to get W. M. Collins' affidavit as to said Harrell's statements. J. B. Pucket affirmed that he heard Harrell say, soon after the difficulty between defendant and one Robinson, that " they should take said Hunter up and hang him." Affidavit of one McCall, that B. W. Collins reviewed his affidavit sometime after it was made, and said it was correct. Affidavit of prisoner and his counsel, that they did not know these things before the verdict.

In reply the State's counsel produced the following evidence : .Affidavit of Harrell, that when on his *voir dire* he stated that " he had heard a good deal said about the case ; that when he heard these reports he supposed he made up an opinion ; that sometimes he heard reports adverse to the prisoner and would have an unfavorable opinion to the prisoner ; sometimes he heard favorable reports in regard to the prisoner, his opinion would be favorable to him ; that at the time of the trial he had no opinion, one way or the other, in regard to the guilt or innocence of the prisoner, and he would require strong evidence to hang a man." He further affirmed that he was impartial, and had decided on the evidence without reference to reports or former opinions, hoping defendant would vindicate himself at the trial. Further, he and prisoner had been friends from boyhood, and he gave the verdict reluctantly and only because he felt the evidence compelled him to do so ; that Martin Collins, since making his affidavit, had told him that what he intended to say was that Harrell said, " *if* what *he heard was true*, defendant should be hung," and that he supposed it was

so, not being able to read or write; that he had seen the other Collins, a boy ten or twelve years old, and desired to question him about said affidavit, but was prevented from seeing him by his two uncles, one of whom said the boy would tell anything, and the other of whom said he should tell nothing but what his father had told; that he did not see Mrs. Rainey at the time specified by her, and never said what she attributed to him.

Two jurymen swore Harrell was the last to agree to the verdict. Another said he was last or next to last. One Stotemaker and one Stansel, each testified that the elder Collins told him that what he heard Harrell say was qualified as stated by Harrell's affidavit, *ante;* "if," etc., and that if he had said otherwise he would go and correct it, that he did go next day, but said McCall had the affidavit and was out of the way.

Mrs. Rainey, by another affidavit, said that all she heard Harrell say was, if reports were true and Hunter was guilty, he ought to be hung. Dunn affirmed denying the assertion as to him, made by Timothy Collins, and stated the same substantially as did Harrell as to the uncles keeping them from conferring with the boy.

The Court refused a new trial and sentenced defendant to be hung. Error is assigned on each of said grounds in the new trial.

(NOTE.—When the cause was called here it was ascertained that several affidavits and the articles from the Quitman Banner, were not in the bill of exceptions. By consent the Court allowed them put in here.)

HANSELL & HANSELL, J. L. SEWARD, W. C. McCALL, E. R. HARDEN, A. T. McINTYRE, for plaintiff in error. As to venue: Revised Code, sections 4593, 4966, 5201; Acts of 1868, 133. As to the sayings of Jesse Hunter, rumors, etc.: Revised Code, sections 3717, 3729; 31 Georgia Reports, 424, 470; 29th, 431; 1 Phil. on Ev., top page

233; 11 Georgia Reports, 233; Roscoe, 23. As to sustaining impeached witness: 16 Georgia Reports, 200; 17th, 482. If charge wrong, new trial: 25 Georgia Reports, 184; 30th, 102; Code, section 425; 38 Georgia Reports, 441, 509, etc.; Code, section 3664; 14 Georgia Reports, 137, 216; 17th, 399, 415. As to the juror, Harrell: 9 Georgia Reports, 121, 129; 31st, 191. Maxwell impeached himself, and verdict is wrong: 23 Georgia Reports, 297, 576. Circumstantial evidence: 34 Georgia Reports, 342. Either ground too weak, take all: 20 Georgia Reports, 528; 33d, 571.

W. B. BENNETT, Solicitor General; H. G. TURNER, for the State. Verdict supported by evidence: 28 Georgia Reports, 192, 484. As to change of venue and jury: 24 Georgia Reports, 286; 14th, 14. Judge as trior decides finally: 22 Georgia Reports, 545; 23d, 62. As to sustaining Maxwell: 1 Gr. Ev., sections 461, 462, 464, 469; 20 Georgia Reports, 264; 16th, 202; Code, section 5718. As to rumor of Alexander's marriage: 1 Gr. Ev., sections 100, 123; 14 Georgia Reports, 55; 17th, 484. Motive of slayer: 5 Georgia Reports, 137; 10th, 55. Confessions, weight of: 17 Georgia Reports, 146; Code, section 3739; Gr. Ev., section 49; 36 Georgia Reports, 473, section 5; 27th, 696, section 4, 5; 12th, 148, section 5. Erroneous charge ground for new trial under Act 1853–4: 17 Georgia Reports, 202, changed by the Revised Code. Bad charge not necessarily followed by new trial: 14 Georgia Reports, 55. As to charge as to commuting punishment, error was in defendant's favor: 38 Georgia Reports, 571. As to jury reading the Banner: 37 Georgia Reports, 334; 21st, 225; 22d, 556, 557; 23d, 225; 26th, 601; 27th, 294; 34th, 325; 39th, 125. As to sayings of juror, Harrell: 15 Ga. R., 223, 241; 24th, 286; 14th, 713. Counsel knowing the jury had Banner waived it by silence: 28 Georgia Reports, 442; 23d, 57; 9th, 125; 33d, 101; 27th, 294; 26th, 601; 28th, 581;

Hunter *vs.* The State of Georgia.

36th, 345; 37th, 334; 38th, 69. Presumption in favor of Court below: 22 Georgia Reports, 194. Verdict must stand unless shockingly wrong: 26 Georgia Reports, 276; 35th, 81; 38th, 506, 587; 18th, 346; 28th, 67, 194; 33d, 136, 268; 2d, 183; 10th, 524.

LOCHRANE, Chief Justice.

1. This was an indictment from Brooks Superior Court. Preliminary to the trial a motion was made to change the venue, which was overruled by the Court, and this is the first ground of error assigned. This motion was predicated upon the affidavit of the defendant, in which he alleges that upon the ground of excitement and prejudice, he could not obtain a fair trial in the county of Brooks. The Constitution of 1868, Code, section 5102, declares that criminal cases shall be tried in the county where the crime was committed, except cases in the Superior Courts where the presiding Judge is satisfied that an impartial jury cannot be obtained in such county. The law is silent as to the mode of ascertaining, by the presiding Judge, the fact upon which this judicial discretion is to be exercised. *The presiding Judge must be satisfied,* and inasmuch as this question has been the subject matter of grave forensic disputation, we feel invoked to express our opinion. We premise by saying, that we do not think the affidavit of the defendant as to the existence of excitement and prejudice against him ought to be sufficient to invoke a change of venue. It is but natural that a community of peaceful citizens, attached to law and the good order of society, would feel the shock produced by a great crime, and exhibit towards the criminal some of that natural and healthy dislike, which he would more aptly term excitement and prejudice. It is only in such cases where such a community have given utterance to their feelings by prejudging the case, and an upheaval of popular indignation has shaken the sober convictions of the people,

so as to include within its influence those who are otherwise qualified as jurors, and exclude the idea of a fair and impartial trial, that the Court would be properly informed, so as to be justified in changing the venue.

Such an exercise of power was not, in our opinion, delegated by the Constitution as comprehends its capricious exercise, but only in cases where the facts are developed by the strongest proof. And while we do not lay it down as a legal rule that the Judge should first try to obtain a jury by the ordinary process of the Court, before changing the venue, still we are clear in the opinion that, perhaps, this is the most satisfactory test, and the one most in consonance with the provisions of the legal interpretation of the Constitution. And in the case at bar, we concur with our Brother Alexander in the mode and manner in which he exercised this judicial duty, and affirm his judgment upon this point.

2 and 3. The second ground which we will review, is in relation to the admission of the sayings of Sampson Maxwell, one of the witnesses for the State. It appeared, on the examination of this witness, that at the time of the homicide, he was one of the servants of the accused, and on the trial before the inquest, had given in evidence statements contradictory of that which he was then giving. Upon cross-examination as to this fact, in which he admitted this contradiction and inconsistency, he gave as a reason that he was afraid of the defendant, who, on the night of the homicide, had told him he would be in danger if he ever said anything about his shooting the gun; and also what he had stated to Jesse Hunter, brother of the accused, and his reply, to " keep that to yourself till the judgment day;" also, in admitting the testimony of Turner, as to the conduct and appearance of Sampson Maxwell on the previous examination, and also allowing evidence as to rumors in the neighborhood relative to the marriage of Miss Gaulding and deceased.

It was urged by counsel for the accused, that the above evidence ought to have been rejected, upon the ground, first, that

Hunter *vs.* The State of Georgia.

it was hearsay, and that it was illegal to admit evidence to sustain a State's witness, and that before he was impeached by the witness of the defense the rumors were not admissible under the facts in this case.

We propose briefly to glance at the character of this evidence and the conduct of the parties, before reviewing the question of the admissibility of this evidence :

It appears that the accused was a rejected suitor of Miss Gaulding, and that Alexander, the deceased, was an accepted suitor. On the night of the homicide the prisoner passed by Captain Gaulding's gate, in returning from Colonel Jones' to his own house, and there saw the horse of Alexander, hitched or standing. Immediately on his return home, he cleaned out and loaded his gun with buckshot, hurrying supper, and went out with the gun. At a point between his own house and Captain Gaulding's, some half way, a gun was fired, and soon thereafter the horse of Alexander galloped by the gate of Hunter. In a short time Hunter returned through the fields to his own house, with his gun, and met Sampson Maxwell in the yard and a conversation took place, about which he testified. A company of serenaders returning from Captain Gaulding's found the dead body of Alexander on the road. They came on to prisoner's house, finding him up and they told him that they had found Mr. Alexander dead. The prisoner went to where Alexander was lying, having a lamp, but sat down with some others and waited the arrival of Captain Gaulding, apparently as if he did not know who it was. Before any accusation was made against him, he consulted with Colonel Jones about making his escape, and sent a party to Maxwell to see what he would swear. The day before the homicide he had a conversation relative to the marriage of Miss Gaulding and Alexander, and there was also evidence of some bad feeling existing between Hunter and Alexander, on account of the marriage, and evidence of some private conversations between himself and Maxwell.

Upon his trial for this homicide, the testimony of Maxwell in the manner stated was drawn out.

We think there was no error in the Court, under the facts, in admitting the evidence. The attempt of the defendant, by cross-examination, was to impeach the witness in showing his contradictory statements, and he was entitled to give a reason for these contradictory statements elicited by cross-examination, by showing that he was in fear at the time that he uttered them. And the evidence of Captain Turner was properly admitted to show any facts or appearances upon that examination which went to show the witness was laboring under fear. And it was equally his right to show similar statements made by him previous to his relation to the prosecution, which would go to show the truth of his testimony: Greenleaf on Evidence, 1 volume, 469. And the fact that there was a rumor of the approaching marriage of the deceased to Miss Gaulding, was properly admitted as a circumstance in the case, for the purpose of showing motive upon the part of the accused, especially as the rumor was brought directly home to him, and conversations growing out of this, exhibited on his part towards Alexander an unfriendly feeling. It was immaterial, in fact, whether the marriage was approaching or not.

We do not deem it necessary to multiply authority upon these propositions. They stand out under the rules of law, commonly recognized and supported by the opinion of publicists and the adjudication of Courts; and looking to the facts of the case, were material to the elucidation of the truth. The various springs by which human motives are supplied, are frequently difficult to trace, but perhaps none are more difficult than those having their fountain head in envies and jealousies which agitate the human heart. The unfortunate prisoner, from this record, seemed to mark with more than ordinary prejudice, the man to whom he may have attributed his defeat, in the accomplishment of what he regarded the object of his domestic happiness. He evidently

cherished toward him, from the proof in this case, an ani-
mosity kindled out of the embers of his own disappointment,
and by utterances of vindictive feelings, which he could not
suppress, warmed into life the suspicion against himself
before it found existence elsewhere. Its picture became so
vivid on his immagination as to induce him to seek the
advice of Colonel Jones about flying from it before it had
been felt or expressed by others. In the administration of
the criminal law, any fact shedding light upon the motives
of the transaction will not be excluded from the considera-
tion of the jury, whether it goes to the attestation of innocence,
or points to the perpetrator of the crime.

Again, complaint is made that in as much as no evidence
was introduced by the defense, this evidence was improperly
admitted to sustain the witness for the prosecution. It is
not necessary to await the admission of evidence of the
witnesses for the defense, to support the witness for the State,
by the admission of material evidence supporting them, as to
the truth of their testimony, and this is especially true from
the fact that the defense may introduce no testimony.

4. During the argument counsel insisted upon the author-
ity in 17 Georgia, that confessions were the highest species
of evidence, while the counsel for the defense, under the au-
thority of the Code, section 3739, insisted they were not.
The Court was requested by defendant's counsel to charge
that confessions were the highest evidence, which he declined,
and charged the jury in the language of the Code.

We see no error in the charge made by the Judge, under
the laws of this State. He charged the jury what the law
was, and it was not his duty to have intimated to them its
effect or to have graded its influence upon their verdict by
any classification.

It is alleged as error that the Judge charged the jury un-
der the general rule to reconcile the testimony, and the ground
of complaint is, that this rule does not apply to cases where
the evidence is only introduced by the State. We hold the

rule is equally applicable, whether there be evidence by the defense or not. The rule in relation to evidence is without exception.

5. Another ground of error complained of is, that the Court charged the jury in this case in relation to circumstantial evidence. In the view we take of the case under the facts proven, the charge of the Judge below on this subject was not only correct, but proper.

6. In relation to a portion of the jury before the completion of the pannel reading the "Quitman Banner," it appears that this newspaper contained no portion of the testimony, either for or against the prisoner, but contained a diatribe against one of the counsel of the accused for a speech made on the motion to change the venue. It is difficult to draw any line sufficiently well marked to constitute a rule upon this subject, and we can readily appreciate the propriety of keeping the jury, from the moment they are sworn in chief, away from all influences and communications which might, in the most remote degree, influence their verdict; but we are not prepared to say that the reading of a mere newspaper under the circumstances, being known to the counsel of the accused, not excepted to by him, then and there, and transpiring in open Court, would constitute a ground of error sufficient to set aside a verdict. On the contrary, we hold that it would not.

7. Another ground of complaint is in relation to the competency of the juror, Harrell. We have examined the evidence by affidavits, inculpatory and exculpatory, and are clearly of the opinion that he was a qualified juror, and sustain the ruling of our brother below, whose pertinent and able opinion embraced in this record entitles it to great weight with this Court.

8. In view of the whole case we are satisfied that the verdict of the jury is sustained by the evidence, and therefore affirm the judgment refusing a new trial.

Judgment affirmed.