## STATE v. WILCOX.

(Filed June 10, 1903.)

1. EXPERTS—*Findings of Court—Appeal.*

   The finding of a trial judge that a witness is an expert is final if there is any evidence to sustain the finding.

2. EXPERT EVIDENCE—*Opinion Evidence—Physicians and Surgeons—Witnesses—Wounds.*

   A physician may testify as an expert as to the kind of weapon that would produce a wound examined by him.

3. EXPERT EVIDENCE—*Opinion Evidence—Physicians and Surgeons—Wounds.*

   A physician may testify as an expert whether the absence of water from the stomach or lungs of a person, taken from water, indicated that such person was killed otherwise than by drowning.

4. EVIDENCE—*Drawings—Maps.*

   A person may use a map or drawing to demonstrate the relative positions of places involved in the evidence given by him.

5. EVIDENCE—*Flight.*

   Evidence that a prisoner did not escape jail, he having opportunity to do so, is not competent.

6. INSTRUCTIONS—*Circumstantial Evidence — Reasonable Doubt — The Code, Sec. 413.*

   The trial court is not required to give instructions in the language of the prayers, here relative to circumstantial evidence and reasonable doubt; provided the instructions given are correct and cover the various phases of the testimony.

7. EVIDENCE—*Sufficiency of Evidence—Questions for Jury—Homicide.*

   There is sufficient evidence in this case to go to the jury connecting the defendant with the death of the deceased.

INDICTMENT against James Wilcox, heard by Judge *W. B. Councill* and a jury, at March Term, 1903, of the Superior Court of PERQUIMANS County. From a verdict of guilty of murder in the second degree and judgment thereon, the defendant appealed.

*Robert D. Gilmer, Attorney-General,* for the State.
*E. F. Aydlett* and *W. M. Bond,* for the defendant.

CONNOR, J.   This was an indictment against the defendant for the murder of Nellie Cropsey.   The State introduced testimony tending to show that W. H. Cropsey, the father of the deceased, had been living in Elizabeth City since April, 1898; that at the time of the disappearance of deceased and for two years prior thereto his residence was within a short distance of the Pasquotank River.   That deceased was at the time of her death nineteen years old; that the defendant met her in June, 1898, and began paying her attention, he being a young unmarried man; that his attentions were marked by frequent visits, as often as three times a week; that he gave her a number of presents, carried her to ride and sailing and to places of amusement.   "He gave her a silver dish at one Christmas, a pin at the next, and on her birthday in July a diamond ring.   He also gave her small pictures of himself and a parasol."   In September, 1901, defendant and deceased had a "kind of falling out."   She was heard to say to him about the middle of September, "If you are going to act like this the rest of the season, you can stay at home."   About the first of October, 1901, Miss Carrie Cropsey a cousin of deceased, came from Brooklyn to make a visit to the family.   About this time there was a series of religious meetings in Elizabeth City.   Defendant frequently went with deceased and at other times went for and took her home.   She joined the church October 13th.   At the time of the Fair, October 22nd, defendant and deceased were friendly.   He gave her tickets for herself, sister and cousin. They remained friendly until November 7th; prior to that day he visited her every night, sometimes in the afternoon. On the night of November 7th he was at the home of the deceased.   Her sister and cousin were in the parlor with them. When he left, she said "Pull," which meant hurry.   She

went to the door with him and came back immediately. He did not take her remark in fun. He visited the house after that. Deceased never spoke to him after that night, nor did he speak to her. She never went to the door with him after that night. She was seen walking with her cousin and defendant once, her cousin being between them. Deceased was to make a visit to New York, intending to leave on Saturday, November 23rd. This was known to the defendant. On Tuesday afternoon before her disappearance her cousin came home and said she was going to the skating rink with the defendant that night. When he came and rang the bell, deceased declined to let him in. The cousin, Carrie, let him in. When the defendant came in and took a seat, he said to deceased: "I guess your corn is getting better." She turned to her sister, Miss Ollie Cropsey, laughed and said: "A little," in a very low voice. Deceased and her sister were dancing just before defendant came in. Defendant turned to Miss Carrie and said: "I expect it is time you were getting your hat." She went up stairs, leaving Ollie and deceased in the parlor. No words were passed between defendant and deceased. Ollie talked with him. When the defendant and Carrie returned from the rink deceased was writing a letter. They brought some fruit with them, which they put in another room. Defendant did not speak to deceased. After sitting some time deceased said: "I certainly would enjoy a good apple to-night." Carrie turned to defendant and said: "How about the fruit?" He said, "It is yours." Carrie handed the fruit. Deceased said: "No, thanks." She wouldn't have any apple. Defendant staid a little while, took his hat and left. When he was gone, deceased said: "This is a good joke on Jim." She took an apple and commenced eating it. Defendant left about half past ten or eleven o'clock. On Wednesday afternoon, November 20th, 1901, Carrie and one of the sisters of the deceased went to town and

came back accompanied by defendant about half past five. Defendant indulged in some pleasantry with Ollie. He left in about half an hour. No words passed between him and deceased. He returned about eight or half past. Carrie let him in. Roy Crawford was at the Cropsey house, visiting Ollie. He was not on good terms with the defendant. Deceased was sitting at table, sewing. She continued sewing until 9:30 o'clock, when she put her sewing up and got some musical instruments. They had some music. Defendant did not speak to her; "just sat there gazing at nothing;" had hardly spoken to any one. He finally said Miss Burnett was going to be married. The members of the family began to leave the parlor to retire, until deceased, defendant, Ollie and Crawford were the only ones left. Defendant asked if there was any water in the pump. Ollie got up to get a glass. He said: "I don't want your glass, I might poison it." He took his watch out six or seven times. At 11 o'clock he looked at it and said: "Your clock is just like my watch." They all stood up. Roy stood by deceased and took hold of her chin, saying: "You are looking mighty sweet tonight." Ollie said: "As if she don't always look so." Defendant rolled up a cigarette and took his hat, saying: "Mamma said I must be in at 11 o'clock tonight." Ollie said: "Jim, you are getting good." He made some slight remark, took his hat from the rocking chair and started out. When he got in the hall, the door was partly open. He walked out and said: "Nell, can I see you out here a minute?" She looked at her sister, said nothing and went into the hall with the defendant. She was never seen alive again by her family. This was the first time she had gone to the door with the defendant since November 7th. He had been there every other night. He had taken Carrie and a sister of deceased sailing. Deceased left the door open. Ollie closed it. Roy Crawford remained in the parlor with Ollie some time and then went

out.   Ollie went in the front hall with him and found the two doors open and the screen door flapping in the wind.   She said to Roy: "This is funny; Nell gone up stairs leaving me to shut up alone."   She went up stairs and retired.   She felt in the bed for Nell, but she was not there.   In a short time Mr. Cropsey, the father, came down stairs.   Some time after Ollie notified her father of Nell's absence.   Family got up and began to search for her.   It was a very cold, clear, moonlight night.   Father, mother and sisters looked over premises for deceased and called for her.   Could not find her. Before defendant left on the night of November 20th, "the subject of drowning was brought up either by Carrie or defendant."   He said, "That is one thing I would like to do. It is such a pleasant sensation.   I would not mind it."   Deceased said:   "That is one thing I would never want to do. I would not want my hair coming out straight."   Her hair was in curl papers.   She said:   "If I die, I would want to freeze to death."   The Cropsey residence fronts up the Pasquotank River, Riverside avenue running between the front fence and the river.  It is sixty-six feet from the bottom step to the front gate.   The street is thirty-three feet wide.   From the edge of the street to the river shore is one hundred and twelve   feet,   making   the   entire   distance   from   the steps   to   the   river   two   hundred   and   eleven   feet.    A little   to   the   left   of   a   line   from   the   house   to   the street   is   a   summer   house,   about   one   hundred   and   fifty feet from the gate, and about forty or fifty feet to the bank of the river.   A little to the left of the summer house is a fish house,   three hundred and fifty feet, and nearby are some cypress trees in the water.   Up the street eight hundred and fifty feet is the pier of the Hayman Ship Yards, to the end of the pier is about five hundred feet, making thirteen hundred and fifty feet from gate to end of the pier.   The water at the end of the pier is ten or twelve feet deep.   The Tolley

STATE *v.* WILCOX.

house is two thousand five hundred feet from the Cropsey gate. Witness walked it in ten minutes. Defendant lives up that street forty three hundred feet from the Cropsey house, eighteen hundred feet from the Ives place. Several measurements of the water near the Cropsey house were taken, showing depth at 10 feet from shore, 2 1-2 feet; 35 feet from shore, 3 feet deep; running out to 75 feet, 4 feet deep. C. T. Parker testified, that on the night of November 20th he was at Fletcher's store at about 10 o'clock, and remained there about ten minutes. That he was driving a horse to a top buggy, traveling about five or six miles an hour, and passed the Cropsey house. That he met a man and woman near the gate of the Cropsey house, somewhere near there, might have been about the gate, did not know exactly. They were medium size people. Their faces were turned towards each other. The man was taller than the woman. Witness was right close to them. Was in street and they were on the sidewalk. They were walking. Does not know the parties. Knows Wilcox; has known him a long time. It was a bright moonlight night. He took no notice of them. Witness met a man about fifty steps after meeting the man and woman. This man could see the two persons walking the road. There was no crook in the road. Man and woman were talking to each other, he thinks.

Leonard Owens testified, that he has known defendant five years. He was on the street the night of November 20th; was within fifteen feet of Ives' house, between Ives' and Tolly's house about 11:30 o'clock; met defendant, who said: "Hello, old boy." Witness said: "Hello, Jim." He said: "Where have you been keeping yourself." Witness said: "I have been coming and going," etc. Asked him to take a cigarette. Said he was making one. After talking a little they parted and witness went home. Witness went up Hunter street about two hundred yards, crossed and went over to Morgan street,

where he lives. He called his wife and went up stairs. As he was undressing the town clock struck twelve. About four or five hundred yards from where he met defendant to where he lives. Nothing unusual in defendant's appearance or conversation. He talked friendly. Witness passed Cropsey house. Did not know what time.

Captain Bailey testified that Owens left the boat at 11:30 o'clock. He got witness a pint of whiskey and sent it by a negro, Sherman, who witness sent with him. Sherman was back in about ten minutes. Witness' watch was two minutes faster than the town clock.

W. H. Cropsey testified: Deceased was a good swimmer; had seen her plunge into the water. He retired on night of November 20th at 8:25 o'clock; got up at 11:45; blew his lamp out at 12 o'clock; went down stairs at 12:45, and heard dogs barking. Was notified by his daughter of absence of deceased. Searched for her. Went to Dawson, chief of police, and told him about missing deceased. That was about 1:15 o'clock. Dawson came to house with defendant at 4 a. m. Witness' wife was crying. Defendant looked cold and indifferent. His wife asked defendant something. He began to tremble and witness walked out of room. Daughter was well educated and a lively girl.

Dawson testified: Was called up by Mr. Cropsey between two and three o'clock in the morning. Went to home of father of defendant. Went up stairs with defendant's father. Defendant was lying in bed on left side. Mr. Meade was in same bed. Defendant was asleep. Witness called him, saying: "I want you to go over to Mr. Cropsey's with me." Defendant said: "All right, I will go." He got up and dressed and went down stairs. When they got in street, witness said: "Jim, what do you think about this case?" Defendant said: "I don't know what to think." Witness said: "When was the last time you saw Miss Cropsey and where was she?" He said: "I left her

standing on the front porch." Witness said: "Did she seem
to be in any trouble?" He said: "Well, yes. I left her cry-
ing." Witness said: "What was she crying about?" He
said: "I gave her back her picture and she said: 'I know what
that means,' and began to cry, and I turned off and left her."
Defendant said he came home. Witness said: "Now, have you
had any quarrels—had any lovers' quarrels, or anything like
that?" · He said: "Well, no. Nothing more than she
laughed in my face and I told her the laugh would be on the
other side." Defendant said that on the night before that,
that is, Tuesday night, he went in the room and asked her
how her corn was, and he said that was when she laughed in
his face. He also said that some one brought up the subject
of suicide that night. That deceased said that she would
rather commit suicide by freezing than any other way. That
about a year ago in a summer house she said in a crowd that
if she was going to commit suicide, she would drown her-
self and tie a stone around her neck. When they got near
the Ives house defendant said: "Right here last night I met
Leonard Owens about half past eleven." When they reached
the Cropsey house, the family was in the dining room. De-
fendant passed through sitting room. Curtain hanging in
the door. He took hold of it. Mrs. Cropsey came up and
put her arm on his shoulder and said: "Jim, tell me where
Nell is, for your sake, for my sake, and for your mother's
sake. Please tell us where Nell is." He said: "Mrs. Crop-
sey, I don't know. I can swear that I don't know." He
said nothing else. Defendant was put under arrest, and was
released about 12 o'clock on that day. He was arrested a
second time and carried before Mr. Wilson and four other
justices, and released on his own recognizance. He was, at
his own request, sworn and said: That he went to call on de-
ceased, and left about ten minutes after 11 o'clock. That he
rolled up a cigarette and asked Miss Nell to let him see her

in the hall and she went in the hall with him.    That he left
her on the porch crying, and that he had not seen her since.
He did not go back after leaving the yard.    The mayor re-
quired defendant to appear before him every day at 12 o'clock
until further notice, which he did.

Charles Reid, deputy sheriff, testified: That the Sunday
after deceased disappeared, at request of defendant's father
and mother, he went with defendant to Mr. Cropsey's.    On
the way witness said: "Jim, it looks to me like you ought to
explain this, as it is getting you into trouble, not for your sake,
but for your mother's."    After walking about twenty steps
he said: "I have told all I can tell."    Witness took defend-
ant to Mr. Cropsey's at railroad.    They had some conversa-
tion.    They went to the house.    Mrs. Cropsey put her arm
over his neck and asked him if he knew where Nell was, and
if so, to tell her.    He said: "I don't know where she is."    She
then said: "You say you left her crying?"    He said: "Yes."
Mrs. Cropsey said: "Had you ever seen her crying before?"
He said: "I don't know what she was crying about, unless I
told her I was going to quit her."    Mrs. Cropsey was crying.
Defendant's manner was very indifferent.    Defendant showed
witness the position in which he left deceased.    He walked
to the right side of the porch and put his arm up on the porch
and leaned his head against his arm.    The left temple was
exposed.    He said that he was standing on the second or
third step.    He first said he was standing there five minutes,
then said it might have been fifteen minutes.    The people
were engaged in searching for deceased, dragging the river,
etc., thirty-seven days.    Defendant took no part in the search.
One day Mr. Cropsey said to defendant, standing on the
street: "Jim, ain't you ever going to say anything or do any-
thing towards finding Nell?"    Defendant said:    "I have
said all I am going to say and done all I am going to do,"
or words to that effect.    On the day the body was found de-

fendant was arrested. Deputy sheriff said to him: "You are a pretty looking chap for a young lady to go off and drown herself about." He threw himself back in the buggy and laughed and said: "Ain't I though." Witness asked him if he couldn't have seen her from the hill to the house, and he said: "Yes, I could have seen her, and if I had known all this trouble was coming I would have called her sister out before I left." His general appearance and manner is that of indifference.

P. B. Hayman testified: That defendant worked with him from September until the preliminary trials in this case. Once during the time witness said: "I wish we could find her ,or hear something from her." Defendant said: "I wish to the Lord we could," that he would go look for her, but if he found her they would say right off that he had killed her. This was about the time they were dragging for her.

C. A. Long testified: That he was in boat with Mr. Stilman on the river, on December 27th. Went out in small boat from the shore near front of the Cropsey residence. Fifty yards from shore saw body of deceased; top of her head was out of the water, floating. Mr. Cropsey went out and identified the body. There were no weights on it; dress was muddy. Body was nearly in front of residence, between bath house and summer house, looking from the shore. Some bricks near where body was found, some stubble, stumps, etc.

Dr. Fearing, Coroner, thirty-three years old, graduate of College of Physicians and Surgeons, general practitioner, took charge of the body on December 27th, about fifty yards in river. Body was staked and tied, floating face down. Had body covered with quilts and carried to outhouse. Empaneled jury, and sent for Drs. Wood and McMullen. Found no disarrangement of clothing. Took off clothing. Found no evidence of violence at that time. Top skin slipped off

when touched; hair slipped off. Made incision in body. Deceased was chaste. She was a virgin. Cut open stomach. Found one or two tablespoonfuls of fluid,—undigested food. Heart in perfect state of preservation, empty, normal in appearance. Lungs likewise. Cut through large section right lower lobe, found it contained no water. Upon pressure, it emitted a dark, mucous fluid, about half table spoonful. Do not think there was any froth in it. Pleural cavity empty. Did not examine head at that time. Two of jurors thought it looked a little thicker, or enlarged on left side. Jury left and went to town. Went back after dinner. Made an incision all round head above left ear. Began on right side and went to left. No blood in right temple. As we cut through left temple discovered a contusion; a fluid, about a table spoonful dark fluid blood, ran out. It was very blue down to the membrane of the bone. It indicated a wound or contusion. There was no fracture of bone. No evidence of violence to membrane of the brain. Brain was very soft; offensive odor. Of the organs the brain is the seventh in order to decompose. Witness gives opinion that wound on left temple was given with some round instrument, padded. Examination was made about an hour after body was taken out of the water. The condition of the stomach, heart, pleural cavity and lungs indicate that the deceased came to her death by means other than drowning. That she received a blow which stunned her and rendered her unconscious. Body was not swollen. Body of person drowned usually swollen when taken out of the water. Wound had the appearance of having been stricken before death. Dr. Wood assisted in making the autopsy. He testified that he was fifty-eight years old, and had been practicing medicine since 1869.

There was some conflicting evidence in regard to the clothes which the defendant had on the night of the 20th November. Mr. Meade testified that he slept in the same

bed with the defendant. Did not hear him when he came home. Saw defendant's clothes the next morning when he got up that he had worn that night. They were hanging up behind the door. Thinks they were the same he had on at the time of the trial.

The defendant objected to the testimony of Dr. Wood and Dr. Fearing as experts. Dr. Wood stated that from his experience as a practitioner and learning as a physician he considered himself competent to give an opinion satisfactory to himself on medical matters, also as to the death of a person, whether it was caused by drowning or otherwise. That he had no experience before this in examining the body of a person alleged to have been drowned. This was the first autopsy he had made in such a case. That he derived his information from the authorities Reese and Taylor; that from an examination of these authors he was prepared to express an opinion. That they devoted from 8 to 14 pages to the subject of drowning. They are considered standard authorities. Dr. Fearing testified to substantially the same. The court found as a fact that the witnesses were experts. Defendant excepted to the finding of the court and objected to the witnesses testifying as experts in this case. Objection overruled; defendant excepted. If there is any evidence to sustain his Honor's conclusion it is final, and not subject to review. Smith, C. J., in *Flynt v. Bodenhamer,* 80 N. C., 205, thus declares the law: "The court must decide whether the witness has had the necessary experience to enable him to testify as an expert. But the value of his opinion when admissible must be determined by a jury alone and depends upon the opportunities he has had for acquiring skill and knowledge and the use he has made of these opportunities. If a regular continuous practice of his profession for 30 years does not entitle the witness to be regarded as an expert or experienced physician, it is difficult to conceive what would do so." The

finding of the judge is conclusive. *State v. Cole,* 94 N. C., 964, and cases cited. It is not necessary that a physician, learned and experienced in his science and profession, should have actually seen or made an autopsy in a case like the one on trial. In *State v. Clark,* 34 N. C., 152 (155), Ruffin, C. J., says: "That circumstance does not touch the question of competency though it may lessen the credit given to the testimony. . . . It is the point for the man of science to consider whether in a particular state of facts he can or cannot form a sound opinion which would satisfy his own judgment as to the matter of fact. In the next place if it were the office of the court to determine whether the circumstances were or were not sufficient to enable the witness to form such an opinion, it could not be held they were insufficient here merely because exactly such a case as this had not before fallen under the observation of the witness or under his notice in the course of his reading. For the man of science is distinguished from an empiric in nothing more than in not relying on specific and also in not waiting for exact similitudes in things material and immaterial before forming a judgment, whether two patients are laboring under diseases of the same character and requiring the like treatment. It is the province of science to discover general principles from long and accurate observation and sound reasoning." We are of the opinion that his Honor's finding that Doctors Wood and Fearing were experts is sustained by ample testimony. The exception thereto cannot be sustained.

The Doctors were asked the following questions: "Q. From the appearance of that bruise and dark blood and the contusion—was there any contusion?" "A. Yes, sir." "Q. What, in your judgment produced it?" Defendant objected to the witness testifying as to what caused the bruise or contusion on the left temple of the corpse of Ella Cropsey. Objection overruled and defendant excepted. "A. I think

a direct blow produced it." "Q. What shaped instrument would probably have produced that bruise?" Defendant objected. "Q. Upon your examination of that wound are you in a position to give an opinion as to what produced it?" "A. No sir. I could not give a positive opinion." "Q. Upon your examination of the wound, what kind of an instrument or weapon, if any, produced it?" "A. I think some covered instrument would have produced it—a blunt covered instrument." "Q. From the examination of the wound are you prepared to give an opinion satisfactory to yourself as to the character of the weapon or instrument used, if any?" "A. Positively, no; I am not." "Q. From your examination of the wound on the head are you prepared to give an opinion of what caused the bruise?" "An. I think I am sir." "Q. Please give that opinion." "A. I think she was struck by some blunt instrument—something that would not break the skin—a direct blow on the left temple." "Q. From your examination and knowledge of the wound are you prepared to give an opinion as to whether this blow was produced before or after death?" "A. Yes sir." "Q. Please give that opinion." "A. If the wound was inflicted just before death, or just after death, it is hard to tell which, because of the blood being diffused in the muscles of that wound. The blood was circulating from the blow given." To all of the foregoing questions and answers the defendant objected, and upon objection being overruled, excepted. We think the questions and answers competent to be considered by the jury. "In reference to questions involved in controversies like the present, namely, as to the nature and effect of a wound described to a witness, it certainly is to a considerable extent a matter of science. Whether a wound was made by a shot or a sword or other sharp instrument can, beyond all doubt, be better judged of by one who has habitually examined and treated wounds of such kinds."

*State v. Clark,* 34 N. C., 154; Lawson on Expert and Opin-
ion Ev., 125.   "The opinions of medical men are constantly
admitted as to the cause of disease or death or the conse-
quences of wounds . . . . and as to other subjects of pro-
fessional skill."   Greenleaf on Ev., 1 Vol., Sec. 440.

In *Gardiner v. People,* Parker's Crim. Reports, Vol. 5, p.
202, it is held that "Medical witnesses are competent to tes-
tify as to the kind of an instrument or weapon that would pro-
duce a wound or fracture and whether a particular wound or
fracture may have been made with an instrument mentioned
to the witness."   *Williams v. State,* 64 Md., 384; Kerr on
Law of Homicide, Sec. 479; *State v. Harris,* 63 N. C., 1.
Taft, Circuit Judge, in *Manhattan Accident & Indem. Co.
v. Dargan,* 58 Fed. Rep., 945; 22 L. R. A., 620, says: "The
witness was an expert and it is proper to ask his judgment of
the condition which he found in the body of the deceased and
what they indicated as to the cause of his death. Several ques-
tions were submitted to the expert physicians based upon the
assumption that the jury find certain conditions incorporated
in the questions in respect to which there had been testimony
before them, and the opinions of the physicians asked as to the
probable cause of death based upon such finding of fact by
the jury.   The physicians were asked the following ques-
tions:   "Upon a post mortem examination of a person taken
from the water what does the absence of water in the stomach
indicate?"   A similar question was asked in respect to the
absence of water in the lungs.   To each of these questions
witnesses answered that they "indicate that the deceased
came to her death otherwise than by drowning."   To all of
these questions the defendant excepted.   The questions were
formulated in accordance with the rules prescribed by this
court in *State v. Bowman,* 78 N. C., 509.   In *People v. Bar-
ker,* 60 Mich., 277; 1 Am. St. Rep., 501, the question is asked
the witness, "Doctor, from the nature of the examination that

you made of the heart, lungs, eyes, mouth, neck and general appearance, together with the mutilation you have testified to, do you come to any conclusion as to whether the death occurred by drowning or by other means?" to which he answered "Yes; my opinion was that the man didn't come to his death by drowning—that he was dead before he was put into the water." The ruling of the court is directly in point and sustained by numerous other authorities which sustain his Honor's ruling upon the several questions, in regard to the opinion evidence of the experts as to the manner in which the deceased came to her death as indicated by the physical condition found upon the autopsy. Maxwell's Criminal Procedure, 2nd Ed., 204. The weight to be attached to these opinions is peculiarly the province of the jury.

The defendant objected to the diagram made by the witness H. T. Greenleaf by which the witness proposed to demonstrate to the jury the location of the Cropsey residence and other points immediately around there. The objection was overruled and defendant excepted. The defendant also objected to any examination of the witness with reference to the map. The exception cannot be sustained. The map was not admitted in evidence but it was competent "for the purpose of enabling the witness to explain his testimony and enabling the jury to understand it." Diagrams, plots and the like are of frequent use for this purpose in the trial of causes, and for such purpose the use of the map was admissible. *Dobson v. Whisenhant,* 101 N. C., 645; *Riddle v. Germanton,* 117 N. C., 387.

The defendant offered to prove by Mr. Reid the deputy sheriff, that since his incarceration and since the first trial also, he has had opportunities to escape from the jail where he was so incarcerated and that he declined to avail himself of them. The testimony was, upon objection excluded and the defendant excepted. The exact question has been decid-

ed by this court in *State v. Taylor,* 61 N. C., 508, Battle, J., saying: "The argument in favor of the exception is that as the flight of an alleged criminal is admissible as evidence against him, his refusal to flee in the first instance and his declining to escape after having been permitted to jail ought to be admitted as evidence in his favor. The argument is plausible, but it would be permitting prisoners to make evidence for themselves by their subsequent acts." The writer of this opinion speaking for himself has been impressed with the argument, and, subject to well defined limitations, as for instance that the defendant was without any agency on his part given an opportunity to escape and refused to accept, is inclined to the opinion that his conduct is competent to go to the jury to be given such weight as under the circumstances of the case it is entitled to. There is nothing however in this case to take the question out of the well settled rule, and the exception cannot be sustained.

We have disposed of the exceptions made by the defendant to the admission and rejection of testimony and find no error in the rulings of the court. The defendant made a number of requests for instruction directed to the question of murder in the first degree, which, by the verdict of the jury become immaterial and unnecessary to be considered. The defendant requested his honor to charge the jury that the prisoner is not called upon to introduce any testimony until the State has made out its case with evidence sufficient to satisfy their minds beyond a reasonable doubt. This instruction was given. The court was also requested to instruct the jury "This is a case in which the State relies upon circumstantial evidence for the conviction of the prisoner. Before the State can ask you to convict upon this kind of evidence it must prove each material circumstance relied upon, beyond a reasonable doubt and if it fails to prove any material circumstance relied upon it will be your duty to return a verdict of

STATE v. WILCOX.

not guilty." Several other instructions were asked in which the same principle is expressed in different forms. It is well settled that the court is not required to give instructions in the language of the defendant's prayers, provided that the instructions are correct and cover the various phases of the testimony as prescribed by the Act. The Code, Sec. 413. His Honor charged the jury as follows: "What is meant by the term 'reasonable doubt' is, fully satisfied, or satisfied to a moral certainty. The words 'reasonable doubt' in themselves are about as near self explanatory as any explanation that can be made of them." This language has the approval of this court. Dick, J., in *State v. Matthews,* 66 N. C., 106 (114), says: "The rule requiring proof beyond a reasonable doubt does not require the State, even in a case of circumstantial testimony, to prove such a coincidence of circumstances as precludes other hypotheses except the guilty of the prisoner. "The rule is that the circumstances and evidence must be such as to produce a moral certainty of guilt and to exclude any other *reasonable hypothesis.* Where any reasonable hypothesis of innocence exists in the minds of the jury there must necessarily be a reasonable doubt as to the guilt of the accused and he is always entitled to the benefit of that doubt." We think his Honor's charge is in accordance with this principle. His Honor further charged the jury: "In the trial of this case the State relies upon what is known as circumstantial evidence for conviction, hence it becomes the duty of the court to instruct you upon the rules of law applicable to this class of evidence and how it should be considered by juries. Circumstantial evidence is a recognized instrumentality of the law in the ascertainment of truth, and, when properly understood and applied, highly satisfactory in matters of gravest moment. Where such evidence is relied upon to convict it should be clear, convincing and conclusive in its connections and combinations, excluding all rational doubt as

to the prisoner's guilt. . . . . When such evidence is relied on for conviction every material and necessary circumstance must be established beyond a reasonable doubt, and the entire circumstances so established must be so strong as to exclude every reasonable supposition but that of guilt." This language is fully sustained by numerous decisions of this court. His Honor adopted the language used by Merrimon, C. J., speaking for the court in *State v. Brackville,* 106 N. C., 701 (710), and sustained by the authorities cited. His Honor said to the jury: "Reference has been made during the argument of the case as to the sufficiency or insufficiency of the evidence to be submitted to you for your consideration. The court has submitted the evidence to you and you will consider it under the rules I have laid down for your government and render your verdict based upon it." The defendant excepted to this language and contended that it violates the statute prohibiting the judge from expressing an opinion as to the weight of the evidence. We are unable to see how such construction could be placed upon the language of the court. His Honor simply stated to the jury, in view of the argument made by the counsel for State and defendant, that as a matter of law there was evidence to be submitted to them, the weight and credibility of which and conclusions to be drawn therefrom were for their consideration under the rules laid down in his charge. We see no force in the objection. We have examined the several prayers for instruction and the exceptions of the defendant to the charges given. We find no error in his Honor's ruling in respect to them. The charge was clear and presented to the jury the testimony and the law bearing thereupon fairly to the State and the defendant.

The defendant requested the court to charge the jury that, upon the whole of the evidence, they should find a verdict of not guilty. It is upon the exception to the refusal to do so that the defendant's counsel strongly and earnestly urged

STATE v. WILCOX.

upon us to grant a new trial. We have considered the case with that anxious care and solicitude to arrive at a correct conclusion which its importance to the State and the defendant demands. Either the deceased came to her untimely death by self destruction being driven thereto by what strongly impresses us in any aspect of the testimony as a trifling with her affections, or she was the victim of a cruel murder. If the first be true, the defendant is entitled to a new trial and to have the jury instructed that they should render a verdict of not guilty upon the testimony, leaving him to that remorse which would come to him for his treatment of her as detailed by himself. If the last theory be true, nothing but the natural hesitation of a jury to find a verdict for the highest grade of crime upon circumstantial evidence has saved the defendant from the extreme penalty of the law. It is difficult to read the testimony in this case without emotion. It is pathetic and painful. We have, however, considered it in the "dry light" of judicial investigation. "If the evidence taken as a whole will not warrant a verdict of guilty, there is no evidence sufficient to be left to the jury, and the court should so declare." *State v. Powell,* 94 N. C., 965. Again, it is said: "The facts, their relation, connection and combination, should be natural, reasonable, clear, and satisfactory. When such evidence is relied upon to convict it should be clear, convincing and conclusive in its connection and combination, excluding a rational doubt as to the prisoner's guilt, and it is not sufficient to be left to the jury unless in some aspect of it they might reasonably render a verdict of guilty." Brackville's case, 106 N. C., 710. Such is the standard laid down by this Court by which the testimony is to be measured by us in passing upon this exception to his Honor's ruling. By this we are to understand that it is the province of the jury to pass upon the credibility of the witnesses and ascertain the truth of the testimony. The excep-

tion is based upon the assumption that it is all true; that
the witnesses have testified truthfully.   The defendant's con-
tention is that in this view of the case, the State has not
presented such evidence as should have been submitted
to the consideration of the jury.   The defendant earnestly
insists that the evidence points to the fact that the
deceased came to her death by suicide.   It is argued that she
had opportunity, motive, and time to drown herself.   Adopt-
ing the well considered language of the brief of defendant's
counsel, they contend she had the motive—the defendant
had for three years been her lover, the only one she ever
had, he had been loyal to her and regular in his attentions.
Her cousin's visit to the Cropsey home had attracted the
attention of the defendant, his attentions were divided.   She
began to be jealous and treated him coolly; his continued
visits to the cousin made the deceased independent and
appear indifferent.   She continued to love him, kept
his presents and remained in the room when he was
there.   She was lively and tried to throw off this feel-
ing; he returned her pictures and parasol.   On the even-
ing of her disappearance just before she was to leave for
New York she was overcome by the turn in her affairs and
feeling that it was an easy way to end her troubled life she
rushed without stopping to think to the river, and threw
herself in.   This line of thought has been strongly pressed
upon us by the defendant's able and zealous counsel.   To
the adoption of this view there are several serious difficulties.
There can be no doubt that the deceased was deeply grieved
and distressed by the conduct of the defendant, that her
affections were trifled with.   Her conduct showed her to be
a young woman of deep and strong feeling.   The last scene
which we have from an eye witness strongly impresses this
fact upon us.   "As he was leaving the room he said 'Nell
can I see you out here a minute?'   Nell looked at me, never

answered, and went into the hall with him.    This was the last time she was seen alive by any of her family."    So far as it appears that she ever thought or spoke of suicide, she had expressed an abhorrence of being drowned.    We attach however but little importance to the testimony in this respect. Assuming that she ever contemplated suicide by drowning, it is far from clear that she had the time or opportunity for doing so on the night of October 20.    She went on the porch with the defendant at about 11 o'clock.    Defendant says that he left her on the porch at about 11:05 or 11:10.    Roy Crawford left the house in a short time.    Parker passed there evidently a short time after 11 o'clock.    The testimony shows the condition of the river at and near to the front of the Cropsey residence, with its receding shores, is such as to make it necessary for her, if drowned there, to go out 75 feet from the shore before reaching water four feet deep.    At points along the shore where the bank was steep there were bushes and briars.    The testimony in respect to the river and shore all conflict with the theory that she could have thrown herself into the water.    That which is most conclusive against the theory of suicide is what may be termed the natural evidence.    If she walked out into the river upon the receding shore until she reached deep water, it is impossible to understand how she could have received the blow upon her left temple.    That the wound upon the left temple was as described by the experts and three of the coroner's jury is established beyond controversy.    It is impossible to account for it upon any other theory than that she was stricken with some instrument or that she threw herself into the river at deep water and came in contact with some hard substance. In the case of *Cluverius v. Commonwealth,* 81 Va., 825, we find the court discussing the theory of suicide of Lillian Madison.    Lewis, J., says:    "The mark of a straight blow over and back of her right eye which did not abrade the skin could

not have been made by her throwing herself or falling face foremost or headlong and striking upon the brick of the incline to the water in the reservoir, because it is not probable, if indeed it is possible, that such an impingement would not have either staved in her skull or glazed and lacerated her skin." If this unfortunate girl had plunged into the water and struck with sufficient violence to have made the contusion found upon the left temple any hard substance, it would surely have glanced and lacerated her skin. The stumps, bricks and roots spoken of by the witnesses were on the edge of the shore. If she had fallen and struck her head upon them before going into the water and became insensible she could not have gone further. The suggestion that she did so is improbable. The opinion of the physicians that she received the blow from some blunt instrument is fully sustained by the appearance of the wound. The condition of the lungs and stomach of the deceased in the opinion of the physicians are inconsistent with the theory of suicide by drowning. The appearance of the wound, the blood still under the skin, the color, all indicate that the blow was struck during her life. The absence of water from the stomach or lungs indicate either death or insensibility at the time of or prior to being placed in the water. The physicians testify with caution in regard to the conclusions to be drawn from the conditions found upon the body. An examination of Wharton & Stille, Medical Jurisprudence, confirms their testimony and their opinion. The concurrent opinion of two physicians who made the autopsy, that the deceased did not come to her death by drowning, together with the other testimony is certainly sufficient to be submitted to the jury and if believed by them to sustain their conclusion that the deceased did not commit suicide. If the deceased received the wound upon her head before being thrown into the water this would contradict the theory of suicide, and, as we

have seen, it is to say the least exceedingly improbable that she received the wound otherwise than in accordance with the opinions of the physicians.   The work which we have examined upon medical jurisprudence states that the body of a person will remain in the water before rising or floating for a much longer period in cold weather than in warm. The testimony shows that the weather continued cold during the entire 37 days.   The body was in a perfect state of preservation.

Having reached the conclusion that the theory of suicide cannot be sustained, we proceed to inquire whether there is sufficient evidence to go to the jury connecting the defendant with the death of the deceased.   Is is urged that he had the motive, the opportunity, the time.   In a criminal case where all the circumstances of time, place, motive, means, opportunity and conduct concur in pointing out the accused as the perpetrator of an act of violence, the force of such circumstantial evidence is materially strengthened by the total absence of any trace or vestige of any other agent.   Some motive, temptation or evil impulse, we may assume, is the source of every crime.   Not always can we discover what it is, so that the proof of a motive is indispensable to a conviction. Bishop's New Criminal Procedure, (Vol. 1 (4 Ed.), Sec. 1077. "We are all of us apt to act on very inadequate motives and the history of crime shows that murders are generally committed from motives comparatively trivial. . . .   If we should hold that no crime is to be punished except such as is rational, there would be no crime to be punished, for no crime can be found that is rational.   The motive is never correlative to the crime; never accurately proportioned to it." Wharton on Criminal Law, 9th Ed., Vol. 1, Sec. 121.   It is, of course, difficult to the sane mind to understand how from the conditions by which this defendant were surrounded and the relation which he bore to the deceased, it is possible for

him to have taken her life.    Yet it must be conceded that the relations between them were such as to arouse his evil impulse.    What passed between them after she left her sister in the parlor will never be known.

"The various springs by which human motives are supplied are frequently difficult to trace, but perhaps none are more difficult than those having their fountain-head in envies and jealousies which agitate the human heart. . . .    In the administration of the criminal law, any fact shedding light upon the motives of the transaction will not be excluded from the consideration of the jury whether it goes to the attestation of innocence or points to the perpetrator of the crime." *Hunter v. State,* 43 Ga., 483 (523).    A man's motive may be gathered from his acts and so his conduct may be gathered from the motive by which he was known to be influenced. Proof that the party accused was influenced by a strong motive of interest to commit the offense proved to have been committed although weak and inconclusive in itself, yet it is a circumstance to be used in conjunction with others which tend to implicate the accused.    The defendant had the opportunity and was the last person seen with the deceased.    The time which elapsed between the moment that he went out of the door, she following him, and the time he was seen by Owens was sufficient for him to have taken her life.  The blow on the head was but the matter of a moment.    The defendant left the room in the Cropsey house five minutes after 11 o'clock and deceased immediately joined him in the hall, or as he says, on the porch.    He is next seen by Owens at the Ives house about 2500 feet from the Cropsey house at about 11:30, probably, in view of the testimony, ten minutes later. It is in evidence and experience tells us that this distance can be walked by a young man in full health on a cold moonlight night in ten minutes.    Defendant says that he was with the deceased on the porch five minutes and afterwards said ten

or fifteen minutes and left her there crying. Ollie Cropsey says that Crawford left the house 20 or 25 minutes after defendant. She went up stairs and went to bed. In a short time she heard her father get up. He testifies that this was about 11:45. All of which tends to show that defendant had left the house a short time after 11 o'clock. Where was he and where was the deceased between this time and his meeting Owens? He says that he left her crying on the porch. Parker says that he passed the Cropsey house at about 11 o'clock and saw near the gate a man and woman walking on the sidewalk. It is not an unreasonable conclusion to draw that the man and woman seen by Parker were the defendant and the deceased. There is no suggestion to the contrary. If so, defendant is contradicted in saying that he left her on the porch. If they were on the street walking, where were they going, what became of her? No one saw her after she left her sister to go into the hall with defendant, unless Parker did, until 37 days thereafter her lifeless body is found 50 yards in the river in front of her father's house with a contused wound upon her left temple. Who the man was seen by Parker, walking 50 steps away from the man and woman, is left to conjecture. It would have thrown much light upon this mysterious case if this man had been called as a witness. Parker says he could have seen the man and woman. The deceased met her fate within this half hour. The defendant is, of all persons in the world, most deeply interested in accounting for his every movement from the moment that he asked deceased to go with him into the hall and the moment he met Owens near the Ives place. There is not the slightest suggestion that any one, save the defendant, had either the opportunity or any motive to take her life or do her harm. There is not a suggestion that she had offended another human being. He says that he told her that he was going to quit her; that he gave her back her picture, that she said she knew

what that meant; that he walked off and left her crying and did not look back. While the conduct of a man under the circumstances surrounding the defendant from the time that he was awakened by Dawson and told that Nellie Cropsey was missing and the time that her body was found, should not be viewed with an eye to detect guilt in every movement, words spoken and expression used, yet such conduct is competent to be considered by the jury to aid them in ascertaining the truth. The defendant's conduct is difficult to understand and interpret viewed from any standpoint. His indifference to the fate of the woman towards whom he had occupied the relation of an accepted suitor for nearly two years and with whom he had been trifling for one month, finally giving to her affections and pride a deadly thrust, by telling her that he was going to quit her, is difficult to understand. His total indifference to the grief of her mother as she appealed to him by the most tender and sacred ties for the sake of his own and the mother of the missing girl, to tell her something to throw light upon the terrible mystery surrounding the fate of her daughter when as we may readily understand her memory is surrounded by suggestions darker and more terrible than death itself, is incomprehensive. Not one word of sympathy or comfort or offer of assistance came from him. When the father makes the final appeal to him, with cold indifference he says: "I have said all that I am going to say and done all that I am going to do." And when he learned that her body had been found and the suggestion is made to him that she had drowned herself because of him, he laughs and indulges in levity. But it is said that he did not flee; that although given every opportunity to do so he remained at home; that he denied knowing her whereabouts, that he said he last saw her on the steps crying. These facts were submitted to the jury and given their proper weight. "It can not be said that the verdict of the jury in this case although founded on circumstantial evidence alone was without evidence or plainly

STATE *v.* WILCOX.

against the evidence. The circumstances proved pointed with fatal precision to the plaintiff in error, and there is not a circumstance which points to any other person or agent. The theory of suicide finds no substantial support from the proved facts. All the surroundings of the deceased on that dreary and dismal night, remote from human habitation, in that gloomy locality, led away from suicide, without the proved facts indicating violence to her person and plainly destroying the idea of suicide. The jury were the triers of the fact, and they have rendered their verdict of guilty and the court below did not err in refusing to set it aside and grant a new trial." This language used by the court in *Cluverius v. Commonwealth,* 81 Va., 825, in so far as it applies to the facts in this case, appropriately expresses the conclusion to which we have arrived. We think that measured by the standard prescribed by law, the evidence was properly submitted to the jury and we can not say they have not reached a correct conclusion. Human tribunals can only deal with such cases in the light of such testimony as it is possible to obtain. No man can say with absolute certainty what the very truth of the matter is, but calling to our aid the experience and wisdom of the sages of the law and examining the testimony as it is certified to us, we are of the opinion that it is sufficient to bring the minds of an intelligent and fair-minded jury under the instruction of a learned, just and impartial judge, to the conclusion to a moral certainty that the defendant is guilty. That is the extent of our duty. In the discharge of it we must declare that we find in the record

No Error.

DOUGLAS, J., concurring only in result. I cannot concur in the opinion of the court as to the weight of the evidence. All that I can say, in justice either to the prisoner or myself, is that an impartial jury has found him guilty upon evidence *tending* to prove his guilt. Further, I can not go.