[Crim. No. 324. First Appellate District.—July 25, 1911.]

## THE PEOPLE, Respondent, v. JOHN D. KNAPP, Appellant.

CRIMINAL LAW—MURDER—SUPPORT OF VERDICT.—It is held, upon a review of the evidence, that the verdict found against the defendant appealing of guilty of murder in the first degree is supported by the evidence.

ID.—SLIGHT APPARENT MOTIVE.—Although there was but slight apparent motive for the killing, yet proof of motive is never indispensable to a conviction.

ID.—DEATH FROM FRACTURE OF SKULL—ABNORMAL THICKNESS—OPINION OF AUTOPSY SURGEON.—Where the death was caused by the fracture of the skull of the deceased, it was competent for the autopsy surgeon, after testifying that the deceased had an abnormally thick skull, to testify to his opinion that it would require a heavy blow with some instrument to cause that fracture.

ID.—RULE AS TO EXPERT EVIDENCE OF PHYSICIAN OR SURGEON.—Any witness familiar by experience with the treatment of wounds, particularly a physician or surgeon, may give an opinion as to the manner in which a mortal wound was probably inflicted, and as to the kind of a weapon used; and whether a particular wound could have been produced by a particular instrument is a question on which the opinion of experts can be asked.

ID.—MOTION TO STRIKE OUT ANSWERS PROPERLY DENIED.—A motion to strike out an answer as not responsive and as argumentative was properly denied, as being too general, where part of the answer is clearly responsive.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco, and from an order denying a new trial. Frank R. Willis, Judge presiding.

The facts are stated in the opinion of the court.

Frank McGowan, and Elmer Westlake, for Appellant.

U. S. Webb, Attorney General, and George Beebe, Deputy Attorney General, for Respondent.

KERRIGAN, J.—The defendant was convicted of murder in the first degree, and the jury fixed his punishment at im-

prisonment in the state prison for the term of his natural life.

The attorney general makes a preliminary objection to the consideration of the appeal, claiming (1) that the record discloses no appeal from the judgment, and (2) that as neither the law nor a rule of court provides a method of appeal from an order denying a motion for a new trial, an appeal from such an order cannot be reviewed.

Notwithstanding these objections, we have examined the record, and the conclusion we have reached on the merits of the case renders a decision of those points unnecessary.

It is defendant's contention that the evidence is wholly insufficient to sustain the verdict of the jury. We will therefore briefly review it.

On the morning of November 14, 1910, at about 8 o'clock, the body of Julia Carey was found in a vacant lot behind some bill-boards near the corner of McAllister and Leavenworth streets in San Francisco. She was a woman who drank heavily, took poor care of herself, and for a long time had been in bad health. She was about seventy years of age, and when her dead body was discovered both eyes were contused, there was a compound fracture of the nasal bone, several contusions of the lower jaw and a fracture of the parietal bone on the left side. This last injury with the subsequent hemorrhage and shock caused her death. The deceased had an abnormally thick skull, and her death, according to the testimony of a physician, must have been the result of a very heavy blow with some blunt instrument. Police Officer John D. Collins discovered the body. Quite a crowd had gathered at the spot, and among them was the defendant. The sides of his face and the backs of his hands were scarred with fresh scratches, and he attracted the attention of Officer Collins. The officer asked him if he knew anything about the death of the deceased, and he replied that he did not. We quote from the testimony of Officer Collins:

"I talked to him quite a little while about the case and of the dead woman. A crowd commenced to collect around us, and finally he said for me to come into the barn. I said, 'What barn?' He said, 'This stable here—Clausen.' He said, 'I worked in there.' So we went in the barn. . . . Other officers joined me, and we commenced questioning him

about the case. He denied that he knew this woman or anything about her death. We took him into custody and examined his room, which was in the stable. The walls of his room were bespattered with blood; the bedclothes and the mattresses were soaked with blood. There was blood also on a coat, vest, a pair of pants, a pair of drawers, a pair of blankets, a pillow, some towels, a sofa cushion and on a handkerchief, all of which was the property of the defendant. An iron instrument which could have produced the wounds was found in the room, containing blood stains. Later, and while the defendant was in custody, a man by the name of Stevens, who had worked around the barn with the defendant, was arrested; and the defendant, referring to the arrest of Stevens, said, 'What in hell do you want to hold Stevens for? He doesn't know anything about this case, for he was not there when the thing happened.' "

The day after the homicide Frank M. Esola, a police officer, found, hidden in the barn, an undershirt belonging to the defendant on which there was some fresh blood.

The defendant, when questioned about the scratches on his face, responded that he did not "know how he got them," that he must have "fallen out of bed."

It is evident that the body of the deceased was dragged from the barn to the place where it was found, for there was a trail between those two points made by the dragging of a heavy body over the ground, and on this trail there were spots of blood. Defendant told Officer Esola that there was a "racket" near the stable during the night of November 13th-14th; that "at about 3 o'clock in the morning he was waked up by a noise in the street right outside of his bedroom; that the noise sounded like a man and woman fighting, and that someone apparently fell against the outside of the barn." There were gray hairs, like those of the deceased, on the lapel of defendant's coat. A police officer accused the defendant of having murdered the woman, and he stood silent.

The defendant's explanation of his connection with the matter, given as a witness in his own behalf, is substantially as follows: That on the evening of November 13th he was engaged at work in the stable, when the deceased came in; that he had never seen her before, and she said she had a pain in

her head, and she wanted him to get her some whisky; that he said something to her and went into a stall, and on his return found that she had fallen against the wheel of a spring wagon; that he rendered her some assistance, and she subsequently fell again; that he washed her face with some water and a handkerchief, sat her on a box and told her to rest herself; that she got up from the box, walked into his room and sat on a trunk, holding a towel in her hands; that she continually pleaded with him for whisky, and that he went out to get her some; that he went to a restaurant, got his supper, read a newspaper, played cards, walked back to the stable, tried to arouse the woman, and found that she was dead, whereupon he became horrified, and fainted. When he came to he was bewildered, and remembering that he had before been convicted of murder, concluded that he would be charged with the murder of this woman, and that, in order to screen himself, he dragged the body to the place where found by the officer. He accounted for the scars on his face by saying that when he assisted the deceased to her feet after her first fall she grabbed the side of his face with her hands and scratched him.

The defendant called two character witnesses and some others, who gave inconsequential testimony.

The inference sought to be given by a part of the defendant's testimony is that the deceased fractured her skull when she fell, as he says, against the wheel of the wagon; but according to his testimony she walked after that fall, whereas the uncontradicted testimony of the physicians is that she could not have walked after her skull was fractured. The defendant made inconsistent statements about the circumstances of the crime. As a whole, his narrative is very improbable, and we think the evidence in the case points convincingly to him as the perpetrator of the crime. It may be that the blood on the underclothing of defendant does not suggest very strongly that passion was the motive actuating him to kill the deceased; but someone killed her; and as she was poor, old, penniless and harmless, there could be but little motive on the part of any person to take her life. Whoever killed her had but a slight motive. But it may be said in passing that proof of motive is never indispensable to a conviction. (*People* v. *Durrant*, 116 Cal. 179, [48 Pac. 75].)

We think the jury reached a correct conclusion in the case. But be that as it may, there is certainly an abundance of evidence tending to show that the defendant committed the homicide; a question of law, therefore, is not presented to this court. (*People* v. *Cole,* 127 Cal. 545, [49 Pac. 984]; *People* v. *Mahatch,* 148 Cal. 200, [82 Pac. 779]; *People* v. *Oppemeheimer,* 156 Cal. 746, [106 Pac. 74].)

Dr. C. A. Glover, the autopsy surgeon, was permitted to testify, over the objection of defendant, that it would "require a pretty heavy blow with some instrument to cause that fracture." This testimony, says the defendant, "was a mere speculation, and did not call for expert testimony." The witness had already testified that the skull of deceased was abnormally thick, and later, without objection, that the wound was necessarily caused by some blunt instrument. The testimony disclosed that the skull of the deceased was abnormally thick, and we think the jury, therefore, without this testimony would naturally draw the conclusion that it would take a harder blow to fracture her skull than to fracture a skull of normal thickness. Even if the testimony were improperly admitted, the error would be harmless, but we think the ruling of the court was sound.

"Any witness familiar by experience with the appearance or treatment of wounds, particularly a physician or surgeon, may give an opinion as to the manner in which a mortal wound was probably inflicted; as to the kind of weapon used; as to the distance from which a shot was fired; as to the degree of force employed, and as to the direction of a blow. . . . " (Underhill on Criminal Evidence, sec. 321.)

"Whether a particular wound could have been produced by a particular instrument is a question on which the opinion of experts can be asked." (Wharton on Homicide, p. 943. See, also, *State* v. *Wilcox,* 132 N. C. 1120, [44 S. E. 630]; *State* v. *Breaux,* 104 La. 540, [29 South. 222]; *Tune* v. *State,* 49 Tex. Cr. 445, [94 S. W. 231]; and particularly Fairall on Criminal Law and Procedure, p. 228.)

The same witness, on cross-examination, testified to a certain condition of the defendant's brain; and after denying that he had testified differently at the preliminary examination, he in effect said that if the stenographic transcript of such examination showed that such was the case, then the

reporter was "evidently mistaken." A motion to strike out this testimony on the ground that it was not responsive and that it was argumentative was denied. This ruling is now assigned as error. The point has little merit, but it is sufficient to say that part of the answer certainly was responsive; hence the motion to strike out the whole answer was too general. (*People* v. *Pembroke,* 6 Cal. App. 591, [92 Pac. 668].)

The judgment and order are affirmed.

Lennon, P. J., and Hall, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on September 22, 1911.